# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |
|---|---|
| STEVEN LAU, individually and derivatively on behalf of BUCKS HOSPITALITY LLC, BUCKS ENTERTAINMENT AND RESORT COMPANY LLC, FERRY STREET HOSPITALITY LLC, and FERRY STREET HOLDINGS LLC,<br>　　　　　　　　Plaintiff,<br>　　v.<br><br>SAUMIL AMBANI, SAHIL AMBANI, PRITY DHARA AMBANI, RAJIV AMBANI, MICHELLE CHURCHILL, JOSE ARMANDO MARTINEZ, HITEN KOTHARI, NAITIK PAREKH, NEW HOPE ENTERTAINMENT INVESTMENTS LLC, TOLLHOUSE INVESTMENTS LLC, MEGAWHOLESALE INC., BUCKS HOSPITALITY LLC, BUCKS ENTERTAINMENT AND RESORT COMPANY LLC, FERRY STREET HOSPITALITY LLC, and FERRY STREET HOLDINGS LLC,<br>　　　　　　　　Defendants. | : <br> : CIVIL ACTION<br> : <br> : NO.<br> : <br> : **JURY TRIAL DEMANDED**<br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

_____

## COMPLAINT

Plaintiff, Steven Lau, individually and derivatively on behalf of Bucks Hospitality LLC, Bucks Entertainment and Resort Company LLC, Ferry Street Hospitality LLC, and Ferry Street Holdings LLC, by and through his undersigned counsel, hereby brings this civil action against the above-named defendants (collectively, "Defendants") and states:

## JURISDICTION AND VENUE

1.　　This is a civil action arising out of, among others, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*  This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, in that certain of the claims arise under the laws of the

United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391(a), in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and all except two of the Defendants maintain their principal residence and/or place of business in this District.

## THE PARTIES

3.      Plaintiff Steven Lau is an individual residing at 4525 Wismer Road, Doylestown, PA 18902.  Plaintiff is a fifty-percent (50%) owner and member of Bucks Hospitality LLC, Bucks Entertainment and Resort Company LLC, Ferry Street Hospitality LLC, and Ferry Street Holdings LLC (collectively, the **"Venture Entities"**).

4.      Plaintiff brings this action individually and derivatively on behalf of the Venture Entities to recover for loss to his businesses and property, and that of the Venture Entities, for the unlawful conduct of the Defendants described herein.

5.      Defendant Saumil Ambani (unless otherwise indicated, "Ambani" refers to Saumil Ambani) is an adult individual with an address of 6356 Meetinghouse Road, New Hope, PA 18938. Ambani is an owner and member of New Hope Entertainment Investments LLC, which is a fifty-percent (50%) owner and member of Bucks Hospitality LLC and Bucks Entertainment and Resort Company LLC.  Ambani is also the owner and sole member of Tollhouse Investments LLC, which is a fifty-percent (50%) owner and member of Ferry Street Hospitality LLC and Ferry Street Holdings LLC.

6.      Defendant Sahil Ambani is an adult individual with an address of 6356 Meetinghouse Road, New Hope, PA 18938.  Sahil Ambani and Saumil Ambani are brothers.  Sahil

Ambani owns 23.5% of New Hope Entertainment Investments LLC (with Saumil Ambani owning the remaining 76.5%).

7.      Defendant Prity Dhara Ambani (f/k/a Prity Dhara Patel) is an adult individual with an address of 6356 Meetinghouse Road, New Hope, PA 18938.  Mrs. Patel is Saumil Ambani's wife.

8.      Rajiv Ambani is an adult individual with a business address of 6356 Meetinghouse Road, New Hope, PA 18938.  Rajiv Ambani is the father of Saumil Ambani and Sahil Ambani.

9.      Defendant Michelle Churchill is an adult individual residing at 817 Yearling Drive, New Hope, PA 18938.

10.     Defendant Jose Armando Martinez is an adult individual with a business address of 400 West Bridge Street, New Hope, PA 18938.

11.     Defendant Hiten Kothari is an adult individual with an address of 808 Wesley Drive, Troy, MI 48098.  Mr. Kothari is a member of the same "cash investment network" as Saumil Ambani, and extended a $150,000 high-interest, cash loan to Saumil Ambani to invest in the business ventures described below.

12.     Defendant Naitik Parekh is an adult individual with an address of 3813 W. 10th Street, Torrance, CA 90504.  Mr. Parekh is a member of the same "cash investment network" as Saumil Ambani, and extended a $100,000 high-interest, cash loan to Saumil Ambani to invest in the business ventures described below.

13.     Defendants Saumil Ambani, Sahil Ambani, Rajiv Ambani, Prity Ambani, Michelle Churchill, Jose Armando Martinez, Hiten Kothari, and Naitik Parekh are hereinafter collectively referred to as the "**Individual Defendants**."

14.     Defendant New Hope Entertainment Investments LLC (hereinafter, "NHEI") is a Pennsylvania limited liability company with a business address of 6356 Meetinghouse Road, New Hope, PA 18938.

15.     Defendant Tollhouse Investments LLC (hereinafter, "Tollhouse") is a Pennsylvania limited liability company with a business address of 6356 Meetinghouse Road, New Hope, PA 18938.

16.     Defendant Megawholesale Inc. (hereinafter, "Megawholesale") is a Pennsylvania corporation with a business address of 1135 Cedar Avenue, Croydon, PA 19021.

17.     Defendants Megawholesale, NHEI, and Tollhouse are hereinafter collectively referred to as the "**Ambani Entities**."

18.     Rajiv and Saumil Ambani are the owners of Megawholesale, which is in the tobacco wholesale business, and generates approximately $100 million in tobacco sales annually.

19.     As described more fully below, the Ambanis generate a substantial amount of cash from Megawholesale's tobacco sales, much of which is not reported as income. Specifically, Megawholesale encourages its vendors to purchase its products in cash and off-the-books; and as such, accumulates hundreds of thousands, possibly millions, of dollars that is not reported for tax purposes.

20.     With vast amounts of cash on hand from Megawholesale's unreported, undocumented, and un-taxed tobacco sales, Ambani is constantly devising new ways to launder Megawholesale's money – such as, in this case, injecting huge amounts of cash into companies he "invests" in, only to have the companies pay him even larger loan/interest payments each month that dwarf any profits the companies would generate without the loan/interest payments (which actually cause the companies to lose a great deal of money).

21.     Rajiv Ambani's, Saumil Ambani's, and Sahil Ambani's primary business is tobacco wholesale.

22.     Defendant Bucks Hospitality LLC (hereinafter, "Bucks Hospitality") is a Pennsylvania limited liability company with a registered address of 4525 Wismer Road, Doylestown, PA 18902.

23.     Defendant Bucks Entertainment and Resort Company LLC (hereinafter, "Bucks Resort") is a Pennsylvania limited liability company with a registered address of 4525 Wismer Road, Doylestown, PA 18902.  Bucks Hospitality and Bucks Resort are hereinafter, collectively referred to as the "**Bucks Entities**."

24.     Ferry Street Hospitality LLC (hereinafter, "Ferry Hospitality") is a Pennsylvania limited liability company with a registered address of 7 E. Ferry Street, New Hope, PA 18938.

25.     Ferry Street Holdings LLC (hereinafter, "Ferry Holdings") is a Pennsylvania limited liability company with a registered address of 7 E. Ferry Street, New Hope, PA 18938. Ferry Hospitality and Ferry Holdings are hereinafter, collectively referred to as the "**Ferry Entities**."

## FACTUAL BACKGROUND

**A.     Nature of the action**

26.     This case involves a businessman whose expertise in the hospitality and entertainment industries, and extensive ties in the New Hope, Bucks County community, allowed him to pursue and create the very business ventures at issue in this litigation; and who, in need of funding for his ventures, allowed an investor who he knew little about to join the ventures as a 50% silent partner in exchange for that investor's funding.

27.     Once the investor became involved in the ventures, however, the investor used the businesses to launder large amounts of cash proceeds from the unlawful activity of his tobacco business and "cash investment network"; then stole the business ventures, via multiple enterprises, through a pattern of racketeering activity, including wire fraud, mail fraud, bank fraud, extortion, and money laundering, among others.

**B.      Plaintiff's business ventures, the formation of the Venture Entities (and other enterprises used to carry out Ambani's illegal scheme to defraud Plaintiff), and Ambani's excessive cash injections**

### THE RAVEN
### (The Bucks Entities)

28.     Plaintiff has extensive experience consulting for leading hospitality and entertainment companies in New York, Los Angeles, Miami, and Bucks County.

29.     Plaintiff is actively involved in the New Hope, Bucks County community, where he is on the Board of Directors for the local Chamber of Commerce, the New Hope Borough Council Economic Revitalization Board, as well as various local non-profit organizations.

30.     The only reason the business ventures described herein even exist is due to Plaintiff's background, expertise, vision, and reputation within the New Hope community.

31.     On or about December 15, 2013, Plaintiff began his search for a property to build a music venue in Bucks County.

32.     After meeting with several interested investors and visiting many properties over the course of a year, on December 20, 2014, Plaintiff's real estate agent presented him with an opportunity to purchase a restaurant, bar, and hotel called The Raven, located at 385 W. Bridge Street, New Hope, PA.

33.     On December 23, 2014, Plaintiff submitted a written offer to purchase The Raven.

34.     On December 24, 2014, Plaintiff received an agreement of sale for The Raven.

35.     On January 5, 2015, a real estate agent recommended that Plaintiff meet with Saumil Ambani to discuss investing in The Raven, as Ambani had recently purchased a $3.3 million property from the agent, all in cash.

36.     On January 17, 2015, Plaintiff met with Ambani for the first time.

37.     Like his brother (Sahil Ambani) and father (Rajiv Ambani), Ambani is in the tobacco wholesale business, and has no experience in the hospitality or entertainment industries.

38.     On January 21, 2015, Plaintiff formed Bucks Resort as its manager and sole member.  *See* Bucks Resort's certificate of organization, attached hereto as Exhibit 1; *and* Bucks Resort's original operating agreement, attached hereto as Exhibit 2.

39.     On January 22, 2015, Plaintiff sent Ambani an e-mail outlining the proposed terms for Plaintiff to agree to allow Ambani to participate as an investor in The Raven.

40.     From January 31, 2015 through March 8, 2015, Plaintiff met with Ambani several times regarding Ambani's participation in Plaintiff's business venture at The Raven.

41.     From January 31–March 8, 2015, Plaintiff also met, and continued to negotiate, with other interested investors, as referenced in a February 17, 2015 e-mail exchange between Plaintiff's attorney, Theodore Zeller, and investor, Gary Spindler and his attorney, Gary Kreinik. A true and correct copy of the February 17, 2015 e-mail exchange is attached hereto as Exhibit 3.

42.     On February 6, 2015, Plaintiff alone signed an agreement of sale for The Raven, a true and correct copy of which is attached hereto as Exhibit 4.

43.     On February 15, 2015, Plaintiff executed Bucks Hospitality's original operating agreement as its sole member and manager.  A true and correct copy of Bucks Hospitality's original operating agreement is attached hereto as Exhibit 5.

44.     On February 17, 2015, Plaintiff formed Bucks Hospitality as its sole member and manager.  *See* Buck's Hospitality's certificate of organization, attached hereto as Exhibit 6.

45.     In the February 17, 2015 e-mail exchange between Attorney Zeller and Attorney Kreinik, Zeller confirms that he registered the Bucks Entities as single member entities with Plaintiff as the sole member.  *See* Ex. 3 (e-mail sent by Zeller on February 17, 2015 at 11:55 a.m.).

46.     At this time, Plaintiff was the sole member and manager of Bucks Resort (which was formed to own The Raven, including the land and all improvements thereon) and Bucks Hospitality (which was formed as the operating entity for The Raven).

47.     Plaintiff negotiated a 30-day personal loan from both Gary Spindler and Ambani for the escrow down payment for the sale of The Raven.

48.     On February 23, 2015, Plaintiff agreed to accept Ambani's $100,000 loan while partnership discussions continued with Ambani and Spindler.  *See* draft of $100,000 promissory note with Ambani as lender, attached hereto as Exhibit 7; *and* check from Ambani for $100,000 dated February 23, 2015, attached hereto as Exhibit 8.

49.     On March 9, 2015, Plaintiff received a counter-proposal from Ambani regarding Ambani's participation in The Raven. *See* e-mail from Ambani, attached hereto as Exhibit 9.

50.     In the March 9th e-mail, Ambani states that, after having discussed The Raven with his father (Defendant Rajiv Ambani), Rajiv Ambani set forth the terms under which he would be willing to fund Saumil Ambani's investment in The Raven.  *Id.*  Ambani also stated "we would like to form our own Holding company, which would then invest in your LLC or venture."  *Id.*

51.     On March 11, 2015, Plaintiff responded to Ambani's March 9th e-mail; and Ambani responded to Plaintiff.  *See* March 11, 2015 e-mail correspondence, attached hereto as Exhibit 10.

52.     In the March 11th e-mail, Ambani again stated "I'D LIKE TO FORM MY OWN LLC WHICH WILL INVEST IN BOTH YOUR LLCs." *Id.*

53.     Plaintiff's and Ambani's e-mail exchanges were often interstate, between and among Pennsylvania, New Jersey, New York, and Nevada.

54.     Further, the e-mail accounts used by Plaintiff (*i.e.*, the voltawine.com and theraven.net servers) are based in Arizona (GoDaddy.com); and as such, any e-mail sent to or by Plaintiff is routed to and from Arizona.

55.     On or around March 12, 2015, Plaintiff agreed to allow Ambani to participate as an investor in The Raven. Specifically, it was agreed that, in exchange for Ambani's making aggregate loans in the amount of at least $650,000 (at 15% interest) to fund Plaintiff's venture (The Raven), Ambani would become a 50% owner of The Raven – that is, Ambani would become a 50% member and owner of the Bucks Entities.   There is no promissory note, or other documentation, memorializing this agreement.

56.     Pursuant to the foregoing agreement, on March 12, 2015, Ambani paid a $100,000 deposit in connection with the agreement of sale for The Raven.  *See* Ex. 4.

57.     On March 16, 2015, Ambani delivered $30,000 cash to The Raven.  Ambani instructed Plaintiff to keep as much cash out of Bucks Hospitality's accounts as possible, and only make deposits as needed.

58.     On March 17, 2015, Plaintiff completed an application with the Pennsylvania Liquor Control Board ("LCB") for The Raven to obtain a liquor license.

59.     On March 17, 2015, Ambani formed NHEI to hold Ambani's 50% interest in the Bucks Entities. *See* NHEI's certificate of organization, attached hereto as Exhibit 11.

60.     Saumil Ambani is a 76.5% owner and member of NHEI; and Sahil Ambani is a 23.5% owner and member of NHEI.  *See* list of NHEI's members and ownership percentages, attached hereto as <u>Exhibit 12</u>.

61.     On April 10, 2015, Ambani made a second deposit on the agreement of sale for The Raven in the amount of $98,000, which was funded by Defendant Megawholesale (and went through Ambani, then to NHEI, before being paid to Bucks Resort).  A true and correct copy of e-mail correspondence documenting the $98,000 wire transfer is attached hereto as <u>Exhibit 13</u>.

62.     On May 5, 2015, Plaintiff and Saumil Ambani began the Small Business Administration (SBA) loan application process with regard to financing The Raven; specifically, with regard to funding the purchase and operation of The Raven.

63.     In connection with the SBA loan application for The Raven acquisition, Plaintiff was required to provide a myriad of documents, such as: (1) Saumil Ambani's personal financial statement, dated May 31, 2015 (which is attached hereto as <u>Exhibit 14</u>), indicating that he had very few liquid assets; (2) Sahil Ambani's personal financial statement, dated March 16, 2015 (attached hereto as <u>Exhibit 15</u>); (3) Sahil and Saumil Ambani's personal financial statements for subsequent years (*see, e.g.*, Saumil Ambani's 2015 and 2016 personal financial statements, attached hereto as <u>Exhibit 16</u>); (4) a residential loan application from Saumil Ambani (attached hereto as <u>Exhibit 17</u>); (5) Saumil Ambani's 2013-2015 tax returns (*see, e.g.*, Ambani's 2015 return, attached hereto as <u>Exhibit 18</u> (indicating a salary of $1,553,418); and (5) Megawholesale's 2014 tax return (attached hereto as <u>Exhibit 19</u>).[1]

---

[1] Plaintiff acquired some of these documents after the August 18, 2015 closing, and therefore did not submit them to the SBA during the application process.  The documents that were specifically required for the SBA loan application were: (1) personal financial statements; (2) three months of personal bank account statements; (3) three months of Megawholesale's bank statements; (4) 2013 and 2014 personal tax returns; (5) Megawholesale's 2013 and 2014 tax returns; (6) source of funds

64.     Despite Ambani having a total income of $1,553,418 in 2015 (Ex. 18), his May 31, 2015 personal financial statement indicates he only has $40,700 in cash (Ex. 14), his March 2016 personal financial statement indicates that he only has $62,000 in cash, and generally has few liquid assets.  *See* Ex. 16.  Yet, in his residential loan application, Ambani represents that he has $1,775,000 of liquid assets.  *See* Ex. 17, p. 3.

65.     Based on the representations made in the above application, on July 29, 2015, Plaintiff received a conditional approval letter from Parke Bank regarding the SBA-backed loan for the purchase and operation of The Raven in the amount of $4,325,000, which included $3,500,000 for the purchase of the land and building, $525,000 for the purchase of the business, and, in combination of funds advanced by the borrowers, working capital of $107,000, and $193,000 in closing costs (the "Loan").  A true and correct copy of the letter is attached hereto as Exhibit 21.

66.     Before closing for The Raven, on July 30, 2015, Plaintiff, Saumil Ambani, and Sahil Ambani signed a memorandum of understanding memorializing their agreement that: (1) in exchange for the Ambanis funding $650,000 toward The Raven (as a loan with 15% interest), the Ambanis would receive 50% interests in the Bucks Entities; (2) based on his "extensive experience in the entertainment and hospitality industry," Plaintiff would manage The Raven's day-to-day operations; and (3) the parties would later execute operating agreements for the Bucks Entities. A true and correct copy of the memorandum is attached hereto as Exhibit 22, ¶¶ 1-3, 5, and C.  The memorandum was witnessed by Rajiv Ambani.  *Id.*, p. 3.

---

for down payment (in which Ambani indicated his source of funds was from three years of personal income savings (*see* SBA submission from Ambani, attached hereto as Exhibit 20) – which does not match his personal financial statements or accounts); (7) letter from Megawholesale's accountant; and (8) a check from Ambani to NHEI.

67.     On August 10, 2016 Parke Bank commissioned a residential appraisal report for Plaintiff's home to be used as collateral for The Raven mortgage.

68.     Closing for The Raven and the Loan took place on August 18, 2015, during which time, Plaintiff and Ambani executed operating agreements for the Bucks Entities, a true and correct copy of which is attached hereto as Exhibit 23 (Bucks Resort) and Exhibit 24 (Bucks Hospitality).

69.     Both operating agreements indicate that each of the entities is manager-managed, and that the manager of each entity is Plaintiff.  *See* Ex. 23, pp. 1, 8-10 (§ 5.2); Ex. 24, (same).

70.     During closing, Plaintiff executed a bill of sale for The Raven as member and manager of the Bucks Entities.  A true and correct copy of the bill of sale is attached hereto as Exhibit 25.  Plaintiff was the only member of the Bucks Entities to sign this document.  *Id.*, p. 3.

71.     In connection with the closing, Plaintiff, as mortgagor, entered into a mortgage and security agreement with Parke Bank, as mortgagee, pursuant to which Plaintiff pledged $1.3 million of equity in his home and all his personal property as collateral for the Loan, as evidenced by a mortgage on 4525 Wismer Road, Doylestown, PA 18902, which was recorded on August 19, 2015, and is attached hereto as Exhibit 26.

72.     Plaintiff's pledge of his $1.3 million of equity in his home and all his personal property to secure the Loan was a substantial part of the consideration he gave for his 50% interest in the Bucks Entities (in addition to his vast expertise in the entertainment and hospitality industries, as well as the fact he sought out and identified the opportunity).

73.     Despite Plaintiff's capital contribution of $1.3 million of equity in his home and personal property, Ambani never made any capital contribution to the Bucks Entities, let alone one as substantial as Plaintiff's.

74.     Instead, Ambani contributed high-interest loans to the Bucks Entities; which was money he was never at risk of losing (unlike Plaintiff's pledge of equity in his home and personal property), and which he immediately received interest payments on (unlike Plaintiff, who received no payments for the capital he pledged).

75.     Also during closing, NHEI, Plaintiff, and The Raven's previous owner, Scott Dewitt, executed a non-compete agreement ("NCA"), which provides that Mr. Dewitt is not to compete with The Raven for two years.  A copy of the NCA is attached hereto as Exhibit 27.

76.     On August 18, 2015, Ambani made two wire transfers to the seller in the amounts of $234,000 and $37,220.  The funds for these transfers came from Megawholesale, and went through NHEI (because one of the requirements for the Loan was that funds come from NHEI).

77.     On August 19, 2015, Plaintiff began managing The Raven on a full-time basis, regularly working over 100 hours per week.

78.     On August 20, 2015, Ambani inquired about the percentage of cash sales flowing into the business, and suggested that Plaintiff not report all cash proceeds from The Raven; and, instead, distribute the proceeds among members.

79.     Plaintiff was surprised at this suggestion and refused to make such distributions.

80.     In September and October of 2015, Plaintiff oversaw renovations to The Raven, developed architectural plans to present to the New Hope Borough Council for approving a 400-person music venue structure, and generated press coverage for The Raven (as well as 7 E. Ferry Street, discussed below).  *See* New Hope Free Press articles, attached hereto as Exhibit 28.

81.     Around that time – as Plaintiff oversaw daily management of The Raven, which included overseeing its books and records – it became more and more apparent that Ambani had access to a great deal of cash, and that Ambani preferred to deal in cash whenever possible.

13

82.     In fact, Plaintiff discovered that Ambani was obsessed with two things: (1) hiding cash, spreading cash, paying for things with cash, and being paid with cash; and (2) avoiding taxes.

83.     Ambani was obsessed with these things because the company he and Rajiv Ambani own, Megawholesale, generates $100 million annually in tobacco sales; a substantial part of which is undocumented and unreported because Megawholesale encourages its vendors to pay in cash.

84.     Thus, Ambani is constantly devising new ways to launder Megawholesale's money – such as by injecting huge amounts of cash into companies he "invests" in, only to have the companies pay him even larger loan/interest payments each month that dwarf any profits the companies would generate without the loan/interest payments.

85.     In light of the foregoing, Ambani repeatedly asked Plaintiff: (1) what vendors would accept payment in cash; (2) whether the Bucks Entities attorney would accept payment in cash; (3) where and how much cash came through the door at The Raven;  (4) if he could skim off the top of any cash that came in and distribute it to himself personally; and (5) if the Bucks Entities could do additional construction at The Raven (beyond what was already planned) and pay the contractor and subcontractors in cash.

86.     Ambani also: (1) mentioned putting cash onto MasterCard and Visa gift cards in certain amounts so as to avoid being tracked; (2) wanted to give the seller of Ferry Street (discussed below) $150,000 in cash, which she said no to, but Ambani still gave her $30,000 in cash off-the-books; (3) made large purchases (*e.g.*, land and houses) with cash (*e.g.*, his $3.3 million home and other New Hope properties); and (4) bragged about not having any writing evidencing the $30,000 payment to the Ferry Street seller, and asked if the company accountant was "taking care of business in Panama" (*i.e.*, the Panama Papers).

87.     Ambani also made numerous mentions of the cash counters in his "cash room" at Megawholesale, and repeatedly stated that the majority of Megawholesale's business is in cash, and that almost all of Megawholesale's vendors – who are mostly small convenience stores – pay in cash.  Ambani stated that they had eight cash-counters at Megawholesale and needed more.

88.     Shortly after closing, Ambani began delivering huge amounts of cash in plastic bags to be kept in the safe at The Raven or to be deposited into Bucks Hospitality's bank account (only as needed).  For instance, (1) on October 23, 2015, Ambani delivered $54,000 cash; (2) on October 25, 2015, he delivered $31,000 cash; and (3) on October 30, 2015, he delivered $20,000 cash.

89.     Due to the huge amounts of cash being delivered, the safe was quickly filled to capacity, and Plaintiff had to store cash in the dishwasher, among other places.

90.     In December of 2015, Plaintiff and Ambani submitted an application for a construction loan, and met with a contractor to discuss phase-two renovation plans for The Raven, which included the guest house, restaurant, new bar, and kitchen.

91.     During the meeting with the contractor, Ambani indicated that he could potentially fund the renovations if the Bucks Entities did not receive a construction loan.  Ambani also proposed adding an entire second floor to the hotel complex with an additional 10 hotel rooms. This extensive addition to The Raven structure, if undertaken, would cost in excess of $900,000.

92.     On December 30, 2015, Plaintiff and Ambani (on NHEI's behalf), signed documents indicating that Plaintiff and NHEI were each 50% members of the Bucks Entities. *See* list of members and percentages for Bucks Hospitality, attached hereto as Exhibit 29; *and* first amendment to Bucks Resort's operating agreement, attached hereto as Exhibit 30.

93.     In December 2015, Plaintiff hired a restaurant manager, and in January 2016, he engaged an advertising executive to market The Raven and to manage the guest house.

94.     On January 14, 2016, Ambani delivered $30,000 cash to The Raven.

95.     On January 15, 2016, Plaintiff alone (and counsel engaged by Plaintiff) made a presentation to the New Hope Borough Council asking for zoning relief to build a 400-person music venue – which was approved.

96.     Thereafter, (1) on January 22, 2016, Ambani delivered $25,000 cash; (2) on January 28, 2016, Ambani delivered $10,000 cash; and (3) on February 23, 2016, Ambani delivered $15,000 cash.

97.     On or around March 5, 2016, First National Bank of Newtown denied the Bucks Entities' application for a construction loan for renovations to The Raven. As such, Plaintiff began looking at other options to fund construction costs, including another SBA loan.

98.     Ambani – ever eager to spread Megawholesale's unreported cash and fund payments to himself – suggested that he fund construction costs with additional high-interest, cash loans.

99.     Thus, on March 10, 2016, Ambani obtained two high-interest loans from two members of his "cash investment network": one from Defendant Hiten Kothari in the amount of $150,000, and another from Defendant Naitik Parekh in the amount of $100,000 (collectively, the "Investment Network Loans").

100.    Kothari is based out of Michigan and Parekh is based out of California.

101.    The Investment Network Loans were secured by two promissory notes, dated March 10, 2016, signed by Ambani and Plaintiff as guarantors (collectively, the "Notes"), a copy of which is attached hereto as Exhibit 31.

16

102.     The $150,000 Note – which provided for a $75,000 interest payment (*i.e.*, 50% interest) – was to be paid in full, including interest ($225,000 total), over the span of 43 weeks in 43 equal installments (*i.e.*, $5,232.56 per week).  *Id.*

103.     The $100,000 Note, was also to be paid in full over the span of 43 weeks in 43 equal installments, and in cash (*i.e.*, $2,325.58 per week).  *Id.*

104.     Pursuant to the Notes, on March 11, 2016, Ambani: (1) caused $150,000 to be wired to Bucks Hospitality's bank account (after Kothari wired the funds to NHEI) (*see* domestic wire transfer, attached hereto as Exhibit 32); and (2) delivered $100,000 cash to The Raven which was deposited into Bucks Hospitality's bank account (*see* Quick Report, attached hereto as Exhibit 33).

105.     Thereafter, Ambani insisted that he and/or NHEI receive around $38,000 per month from the Bucks Entities, presumably to repay Defendants Kothari and Parekh for the Investment Network Loans, and/or to pay Ambani back for the loan he provided to fund The Raven (at 15% interest) with laundered money.

106.     The SBA loan documents prohibit interest payments to the Bucks Entities' members.

107.     Ambani insisted that the monthly payments of $38,000 to him/NHEI take priority over all other payments (*e.g.*, distributions of profit to members and payments to vendors).

108.     Within a month, it was clear that The Raven's cash flow did not support monthly payments to NHEI for $38,000; particularly where The Raven generates $230,000–$260,000 of profit each year, and the loan payments to NHEI/Ambani (portions of which were presumably then wired across state lines to Kothari and Parekh) would total $456,000 per year.

109.     As such, Plaintiff asked Ambani to restructure the Investment Network Loans.

110.   Ambani informed Plaintiff that the Investment Network Loans were non-negotiable, and demanded that he continue to receive $38,000 per month.  *See* record of payments from Bucks Hospitality, attached hereto as <u>Exhibit 34</u>, p. 1 (numerous checks to NHEI for $5,232.56 and $2,325.58).

111.   On May 19, 2016, Ambani caused Defendant Michelle Churchill to deliver $150,000 cash to The Raven.  Plaintiff did not request this cash payment from Ambani, which, upon information and belief, was made for the purpose of facilitating the money laundering activities of Ambani.

112.   Due to the substantial monthly payments to NHEI/Ambani, and The Raven's lack of cash to support such payments, Plaintiff removed himself from at least two payroll cycles in an effort to save money and meet the company's liabilities that included mortgage payments and payroll to other employees.

113.   As a result of Plaintiff's efforts to renovate and promote The Raven, by May of 2016, hotel room rates had more than tripled and were booked for many weekends in advance.

114.   A substantial amount of The Raven's business comes from out-of-state; and The Raven purchased many items from out-of-state during renovations.

115.   Furthermore, under Plaintiff's management, between September 2015 and June 2016, The Raven's gross revenue increased between 15%–20% (despite the transition in ownership and construction on premises), and social media awareness of The Raven grew exponentially.

116.   Toward the end of 2015 and into early 2016, Plaintiff began to question Ambani's insistence on investing more and more cash into the company only to pay it back out to himself (*i.e.*, through NHEI).  The Raven was sustainable without Ambani's substantial, and numerous,

cash injections; and the cash injections seemed to serve no purpose, as Ambani withdrew (as loan repayments) more money than he actually injected into the company.

117.    Nonetheless, Ambani continued to infuse the company with cash, depositing an additional $150,000 of cash into The Raven on June 30, 2016.

118.    The Raven would not be where it is today without Plaintiff, who is solely responsible for its current success.  Indeed, it was Plaintiff who discovered the opportunity at The Raven; and it was Plaintiff who alone negotiated the sale of The Raven, had The Raven appraised, successfully petitioned the New Hope Borough to allow a 400-person music venue, applied for and obtained a liquor license, pledged $1.3 million of equity in his home as collateral for the purchase of The Raven (a capital contribution that was never matched by Ambani), oversaw renovations, generated publicity for The Raven, hired key personnel instrumental to The Raven's success, and painstakingly worked 100 hours or more each week managing The Raven.

119.    Other than acting as a passive investor – and injecting hundreds of thousands of dollars into The Raven, only to pay hundreds of thousands of dollars to himself through NHEI – Ambani and NHEI have contributed nothing to The Raven.

### FERRY STREET
### (The Ferry Entities)

120.    On or about December 10, 2015, Plaintiff met with a real estate agent at 7 East Ferry Street, New Hope Borough, PA 18938 ("Ferry Street") to inspect the premises for a potential new venture.  Over the next two weeks, Plaintiff met the agent at Ferry Street numerous times.

121.    On December 24, 2015, Plaintiff met with the owner of Ferry Street, and executed a confidentiality agreement related to the sale of Ferry Street.

122.    During the next week, Plaintiff spoke with numerous investors regarding the Ferry Street opportunity, including Ambani, who indicated that he may not have the funds to invest, and

encouraged Plaintiff to pursue other investors.  Later, however – based on The Raven's success – Ambani made the decision to invest in Plaintiff's new venture at Ferry Street.

123.    Despite having firm commitments to invest from other parties, Plaintiff decided to include Ambani out of courtesy and loyalty because Ambani was a silent investor in The Raven.

124.    Between January 2016 and March 2016, Plaintiff attended several meetings with the seller, real estate agent, and/or the seller's financial advisor.  Ambani was not present for any of these meetings.

125.    The owner and seller of Ferry Street told Plaintiff specifically that, despite other offers, she took a liking to Plaintiff personally, agreed with his vision for the property, and was impressed with his reputation and involvement in the community and his other business in town.

126.    Ambani was not aware of the Ferry Street opportunity, and could never have closed this transaction with the seller.

127.    On February 1, 2016, Plaintiff instructed his and Ambani's mutual attorney, Theodore Zeller, to form Ferry Holdings; and pursuant to Plaintiff's instructions, on February 5, 2016, Ferry Holdings's certificate of organization was filed, at which time, Plaintiff was its sole member.  A true and correct copy of the certification attached hereto as Exhibit 35.

128.    On February 25, 2016 – after Plaintiff agreed to allow Ambani to participate as a silent investor in the Ferry Street venture – Ambani suggested that his shares in the operating entities be put in the name of his then-girlfriend (now wife), Defendant Prity Dhara Ambani (née Patel), "to avoid tax exposure."  See original draft of Ferry Holdings's operating agreement, as drafted by Attorney Zeller, a true and correct copy of which is attached hereto as Exhibit 36, p. 25-26 (listing Ms. Patel as a member).

129.    On February 26, 2016, Plaintiff executed an agreement of sale for Ferry Street.  At this time, Plaintiff was the only member of Ferry Holdings, and Tollhouse had yet to be formed.

130.    On or about March 2, 2016, Ambani proposed to giving $50,000 cash to Plaintiff for closing for Plaintiff to disperse among five friends in increments of under $10,000, then have those individuals "loan" the money back, and deposit it into a bank account unreported.  Plaintiff refused to go along with this scheme.

131.    On March 4, 2016, Ferry Hospitality was formed, with Plaintiff as its sole member. *See* Ferry Hospitality's certificate of organization, attached hereto as Exhibit 37.

132.    On March 9, 2016, Tollhouse was formed and registered with the Commonwealth of Pennsylvania for the purpose of investing in Plaintiff's company, Ferry Holdings. *See* Tollhouse's certificate of organization, attached hereto as Exhibit 38.

133.    Ambani is the sole owner of Tollhouse. *See* Tollhouse list of members and percentages, attached hereto as Exhibit 39.

134.    Also on March 9, 2016, Attorney Zeller sent a memorandum to Plaintiff and Ambani providing, in pertinent part, that Tollhouse was formed for the purpose of Ambani becoming a 50% owner in the Ferry Entities.  A true and correct copy of the March 9th memo is attached hereto as Exhibit 40.

135.    Tollhouse's initial loan amount was to be in excess of $450,000, at a 15% annual interest rate, $225,000 of which was to be used to acquire the liquor license in connection with the Ferry Street premises.

136.    To date, Tollhouse has not invested the $450,000 it agreed to provide in exchange for its participation in Plaintiff's Ferry Street venture.

137.    On or around March 1, 2016, Ambani delivered $15,000 cash.

138.     On March 9, 2016, Ambani brought $48,000 cash to the Ferry Street office and suggested that Plaintiff launder it (as Ambani suggested on March 2nd).  Plaintiff refused, and instead, deposited the money into his personal bank account on March 11th, and immediately withdrew a cashier's check in that amount to bring to closing the next day.

139.     Also on March 11, 2016, Plaintiff's and Ambani's common counsel sent an e-mail to Plaintiff and Ambani with the original draft of Ferry Holdings's operating agreement attached (Ex. 36), as well as a revised version of the operating agreement, which changed the company from manager-managed to member-managed, and changed Ambani's interest in the company from being in Ms. Patel's name to being in Tollhouse's name.  *See* March 11th e-mail, attached hereto as Exhibit 41, and revised Ferry Holding operating agreement, attached hereto as Exhibit 42.

140.     On March 14, 2016, closing was held for the purchase of the Ferry Street property.

141.     During closing, Plaintiff provided a $48,907 certified check and Ambani brought a $35,000 certified check, as well as $30,000 cash to give to the seller, off-the-books, after closing.

142.     Plaintiff executed all documents on Ferry Holding's behalf.  *See* deed for Ferry Street, attached hereto as Exhibit 43; *and* note for Ferry Street, attached hereto as Exhibit 44.

143.     On March 14, 2016, Ferry Hospitality (*i.e.*, the operating entity for Ferry Street) was formed and registered with the Commonwealth of Pennsylvania.  *See* Ferry Hospitality's certification of organization, attached hereto as Exhibit 45.

144.     Starting on March 14, 2016, Plaintiff oversaw renovations to Ferry Street, and was the daily onsite manager at the premises.

145.     On March 16, 2016, Ambani delivered $10,000 cash to Ferry Street; and on March 29, 2016, Ambani delivered $25,000 cash to Ferry Street.

146.    On March 31, 2016, Plaintiff executed an agreement of sale with regard to purchasing a liquor license for Ferry Street.

147.    In April 2016, Plaintiff applied for Ferry Street's liquor license, but was required to wait until the New Hope Borough Council approved the application.

148.    On April 6, 2016 Ambani asked if it was possible to provide the borough transfer funds to Attorney Zeller in cash.

149.    On April 8, 2016, Ambani provided a check from Megawholesale to Attorney Zeller in the amount of $5,000 for the New Hope Borough for the liquor license transfer fee.

150.    Tollhouse agreed to loan $225,000 to Hospitality to acquire the liquor license.

151.    On April 13, 2016, Ambani delivered $23,000 cash to Ferry Street; and on April 14, 2016, Ambani delivered $15,000 cash to Ferry Street.

152.    On April 21, 2016, Plaintiff and Ambani executed a document stating that Plaintiff and Tollhouse were each 50% members of Ferry Hospitality. *See* Ferry Hospitality list of members and percentages, attached hereto as <u>Exhibit 46</u>. *See also* statement of properties owned by liquor license applicants, stating that Plaintiff is a member of Ferry Holdings, Bucks Hospitality, and an owner of Bucks Resort, attached hereto as <u>Exhibit 47</u>.

153.    On April 24, 2016, Ambani delivered $20,000 cash to Ferry Street.

154.    On April 25, 2016, with Attorney Zeller's assistance, Plaintiff prepared and executed a New Hope Inter-Municipal Liquor License Transfer Application in connection with Ferry Street, a true and correct copy of which is attached hereto as <u>Exhibit 48</u>.

155.    On April 28, 2016, Ambani delivered $22,093 cash to Ferry Street.

156.    On or about May 17, 2016, Plaintiff alone attended the New Hope Borough Council meeting and presented his argument for why the Council should approve his application for the

liquor license transfer into the Borough, despite the Borough being above its quota for such licenses.  The New Hope Borough Council unanimously approved Plaintiff's application.

157.    Plaintiff's reputation in the community played a key role in the Council's decision. For example, Plaintiff is on the Board of Directors for the local Chamber of Commerce, the New Hope Borough Council Economic Revitalization Board, as well as various local non-profit organizations.

158.    In contrast, Ambani is not at all active in the New Hope community, and does not know any Council members.  Ambani was not involved in the application for the liquor license; nor did he attend the Council meeting regarding the application for liquor license.

159.    Ambani never participated in the renovations or daily management of Ferry Street.

160.    On June 3, 2016, Plaintiff received a written New Hope Borough resolution regarding Ferry Street's liquor license.

161.    As of June 31, 2016, construction on Ferry Street was nearly complete, and the restaurant (called The Salt House) was close to opening.

162.    The Ferry Street opportunity would not exist had it not been for Plaintiff.  Indeed, it was Plaintiff who discovered the Ferry Street opportunity; and whose ties to the local community and relationship to the seller allowed Plaintiff to pursue the Ferry Street venture.

163.    Further, it was Plaintiff alone who negotiated the purchase of the premises, mortgage, liquor license, commissioned and funded an appraisal, met with numerous potential investors, executed the agreement of sale, conducted inspections, managed renovation, hired contractors, sourced materials, engaged attorneys, petitioned borough council, met with zoning officers, obtained a temporary certificate of occupancy, obtained insurance, designed the interior, purchased fixtures and furniture, contributed personally owned items, conceived of the name and

concept, developed the brand, conceptualized the logo, created the food and drink menus, worked with a graphic designer on a website, met with vendors, met with the Bucks County Health Department to obtain required licensing, met with the New Hope Historical Society, painted the interior, helped construct a new bar, designed the kitchen, purchased equipment, ordered supplies, engaged an accountant and bookkeeper, marketed to the community, generated local press (Ex. 28), negotiated a lease for the outdoor area, booked promotional events and hired a consulting chef and staff, all tasks related to operating both Ferry Entities.

164.    Neither Tollhouse nor Ambani participated in any of foregoing; and Tollhouse and Ambani were completely absent from managing any aspect of the Ferry Entities.  Other than acting as a passive investor, Ambani and Tollhouse have contributed virtually nothing to Ferry Street; and, in fact, have jeopardized the success of the venture at every turn.

## C.    Ambani's money laundering/cash injections into the Venture Entities (*e.g.*, smurfing), and other illegal tax avoidance schemes

165.    As it turned out, when Ambani suggested that Plaintiff not report cash proceeds from The Raven in August of 2015, it was only a glimpse of things to come (as Plaintiff later discovered), because it was Ambani's intention all along to launder unreported cash from Megawholesale (*e.g.*, from the sale of contraband cigarettes),[2] through the Venture Entities – and to eventually steal the Venture Entities from Plaintiff so as to launder his vast amounts of unreported cash without hindrance.

166.    For instance, on or about March 9, 2016, Ambani delivered $48,000 in cash to Plaintiff in connection with Ferry Street.  It was then that Ambani explained the illegal concept of

---

[2] *See* report showing guilty pleas by Ambani in September of 2011 to possession and sales of contraband cigarettes, attached hereto as Exhibit 49.

"structuring" or "smurfing" to Plaintiff (as he alluded to on March 2nd) and instructed Plaintiff to engage in this activity and to bring a cashier's check to closing.

167.    Specifically, Ambani asked Plaintiff to give cash to Plaintiff's friends, and have those individuals return those funds to Plaintiff as "loans" in amounts less than $10,000 for deposit into Plaintiff's personal bank account.

168.    Plaintiff declined to engage in Ambani's proposed "structuring" or "smurfing" scheme, and deposited the $48,000 of cash into his personal account, then immediately drew a cashier's check in the amount of $48,907 to take to closing.

169.    Nonetheless, since becoming involved with the Venture Entities – and despite his purported lack of liquid assets (*see* Ex. 14 and Ex. 16) – Ambani has made numerous, substantial cash injections into the Bucks Hospitality and Ferry Hospitality for as much as $150,000 each.

170.    From March of 2015 through August of 2016, Ambani made the following cash deposits into Bucks Hospitality (The Raven):

| Date | Amount | Form | Source |
|------|--------|------|--------|
| 3/12/15 | $100,000 | Check | Saumil Ambani |
| 3/16/15 | $30,000 | Cash | Saumil Ambani |
| 4/10/15 | $98,000 | Wire from Ambani (origin Megawholesale) | Megawholesale to Ambani |
| 8/18/15 | $234,000 | Wire (closing) | Megawholesale to Ambani to NHEI |
| 8/18/15 | $37,220 | Wire (closing) | Megawholesale to Ambani to NHEI |
| 10/23/15 | $54,500 | Cash | Saumil Ambani |
| 10/25/15 | $31,280 | Cash | Saumil Ambani |
| 10/30/15 | $20,000 | Cash | Saumil Ambani |
| 1/14/16 | $30,000 | Cash | Saumil Ambani |
| 1/22/16 | $25,000 | Cash | Saumil Ambani |
| 1/28/16 | $10,000 | Cash | Saumil Ambani |
| 2/23/16 | $15,000 | Cash | Saumil Ambani[3] |

---

[3] With this cash injection, Ambani provided the promised $650,000 of loans to The Raven (actually $685,000).  Ambani purportedly deposited an additional $850,000 on top of this amount.

| 3/11/16 | $150,000 | Wire (high interest loan) | NHEI from Kothari |
| 3/11/16 | $100,000 | Cash (high interest loan) | Ambani from Parekh |
| 5/19/16 | $150,000 | Cash | Ambani via Churchill[4] |
| 6/30/16 | $150,000 | Cash (purported capital call) | Ambani via Churchill |
| 7/31/16 | $150,000 | Cash (purported capital call) | Ambani/Churchill |
| 8/30/16 | $150,000 | Cash (purported capital call) | Ambani/Churchill |
| **TOTAL:** | **$1,535,000** | | |

171. Further, in only March and April of 2016 (and purportedly in November of 2016), Ambani made the following cash deposits into Ferry Hospitality:

| Date | Amount | Form | Source |
| --- | --- | --- | --- |
| 3/1/16 | $15,000 | Cash | Saumil Ambani |
| 3/9/16 | $48,000 | Cash for closing (given to S. Lau to distribute $10Ks) | Saumil Ambani |
| 3/14/16 | $35,000 | Closing cashier's check from Tollhouse Investments LLC | Saumil Ambani |
| 3/14/16 | $30,000 | Cash | Saumil Ambani |
| 3/16/16 | $10,000 | Cash | Saumil Ambani |
| 3/29/16 | $25,000 | Cash | Saumil Ambani |
| 4/8/16 | $5,000 | Check from Megawholesale for Borough liquor license transfer fee | Megawholesale |
| 4/13/16 | $23,000 | Cash | Saumil Ambani |
| 4/14/16 | $15,000 | Cash | Saumil Ambani |
| 4/24/16 | $20,000 | Cash | Saumil Ambani |
| 4/28/16 | $22,093 | Cash | Saumil Ambani |
| 11/3/16 | $48,011 | Cash (purported capital call) | Saumil Ambani |
| **TOTAL:** | **$296,104** | | |

172. By injecting Bucks Hospitality and Ferry Hospitality with hundreds of thousands of dollars of unreported cash from Megawholesale, Ambani has been able to take the cash out, laundered, by labeling such disbursements as loan and/or interest payments. *See* Ex. 34.

---

[4] This cash injection is being paid back to Ambani at a rate of $14,375 per month (based on a budget provided by Defendant Martinez to Churchill on September 7, 2016).

173.     As discussed, however, the $38,000 of monthly payments to Ambani in connection with The Raven are unsustainable because that amounts to $456,000 per year, and The Raven averages roughly $230,000–$260,000 of profit per year.

174.     Another scheme Ambani uses to avoid reporting income (and paying taxes), is to have his income flow through other people and/or entities, even though it is his income.

175.     For instance, when Plaintiff and Ambani were determining how to structure Ferry Holdings, Ambani wanted his wife, Prity Ambani (née Patel), to be a 50% member (Ex. 36, pp. 25-26) – but decided, instead (after Plaintiff objected), to form Tollhouse and have it serve as a 50% member. *See* Ex. 42, p. 26-27.

176.     Further, Ambani always asked Plaintiff: (1) what vendors would accept payment in cash; (2) whether the Bucks Entities attorney would accept payment in cash, (3) where and how much cash came through the door at The Raven; (4) if he could skim off the top of any cash that came in and distribute it to himself personally; and (5) if the Bucks Entities could do additional construction at The Raven and pay the contractor and subcontractors in cash.

177.     Ambani also: (1) mentioned putting cash onto MasterCard and Visa gift cards in certain amounts so as to avoid being tracked; (2) wanted to give the seller of Ferry Street $150,000 in cash, which she said no to, but Ambani still gave her $30,000 in cash off-the-books; (3) made large purchases (*e.g.*, land and houses) with cash (*e.g.*, his $3.3 million home and other homes in the New Hope area); and (4) bragged about not having any writing evidencing the $30,000 payment to the Ferry Street seller, and asked if the company accountant was "taking care of business in Panama" (*i.e.*, the Panama Papers).

**D.     Ambani steals Plaintiff's ventures through a pattern of racketeering activity, including extortion, mail fraud, wire fraud, bank fraud, and money laundering.**

178.   Once it became clear to Ambani that Plaintiff did not intend to assist in his money laundering schemes (or simply because Ambani intended to do so all along), Ambani – with the help of his cohorts, Defendants Sahil Ambani, Michelle Churchill, Prity Ambani, Rajiv Ambani, Jose Armando Martinez, NHEI, and Tollhouse – began to carry out his scheme to defraud Plaintiff and to steal the Venture Entities from Plaintiff through a pattern of racketeering activity; namely, extortion, money laundering, mail fraud, wire fraud, bank fraud, and access device fraud.

179.   Further, in an effort to illegally squeeze Plaintiff out of his own business ventures, Ambani (through his cohorts) has initiated several unauthorized, and illegal, capital calls – without the consent of Plaintiff, a 50% owner and managing member of each Venture Entities – so as to dilute Plaintiff's interest in each entity, seize the companies from Plaintiff, deprive Plaintiff of profits generated by the Venture Entities, and steal money and assets from the Venture Entities.

### THE RAVEN

180.   The squeeze-out of Plaintiff began on or around May 18, 2016, when Churchill drafted a memorandum of understanding ("MOU") unilaterally appointing herself in charge of Bucks Hospitality's financial statements and accounts, and purporting to change Bucks Hospitality from manager-managed to member-managed in exchange for Ambani's providing additional $150,000 of funding.  A true and correct copy of the MOU is attached hereto as Exhibit 50.

181.   When Plaintiff refused to sign the MOU, Churchill requested a private meeting on June 9, 2016; then threatened Plaintiff by stating that he would be "removed" if he did not sign it.

182.   During the same meeting, Churchill stated, again, that the payments to Ambani were non-negotiable, and explained to Plaintiff that Ambani was part of a "cash network" that invested and loaned cash off-the-books to various businesses and individuals. Churchill further

explained that Ambani and his "cash network" was not something Plaintiff should "mess around with" or "ask too many questions about."

183.   On June 4, 2016, without proper authorization as required by the applicable operating agreements (*see* Ex. 23 and Ex. 24), Churchill purportedly issued a capital call to the members of the Bucks Entities (that is, Plaintiff and NHEI/Ambani).  *See* e-mail correspondence, dated June 4, 2016, attached hereto as Exhibit 51.

184.   Ambani and Plaintiff told Churchill that they did not have the funds to complete a capital call.  *Id.*, p. 1.

185.   Moreover, Churchill did not have the authority to initiate a capital call (nor does Ambani) because that authority rests exclusively with Plaintiff, who is the managing member of each of the manager-managed Bucks Entities.  *See* Ex. 23, p. 1 ("Manager-Managed Operating Agreement"), §5.2 (stating that Plaintiff is the Manager), §3.2.1 (stating that capital contributions are to be determined by the Manager); Ex. 24 (same).

186.   Further, Plaintiff had already contributed $1.3 million of equity in his home to the business (Ex. 26), and as such, under no circumstance should have been required to contribute additional capital, particularly where (1) he did not consent to a capital call; and (2) in light of the huge monthly payments to Ambani, Ambani has never made a reciprocal capital contribution to the Bucks Entities (that is, his loan repayments were never at risk and Ambani received loan/interest payments immediately; whereas Plaintiff's equity in his home is at risk, and Plaintiff has not received interest payments).

187.   As such, Plaintiff told Churchill, Saumil Ambani, Sahil Ambani, and Attorney Zeller that capital calls could not be initiated without Plaintiff's consent, and certainly not by Churchill, who was neither an employee, manager, nor owner of The Raven or the Bucks Entities.

*See* e-mail from Plaintiff to Zeller, dated June 20, 2016, attached hereto as Exhibit 52; e-mail from Plaintiff to Churchill, dated June 20, 2016, attached hereto as Exhibit 53; *and* e-mail from Plaintiff to Saumil Ambani and Sahil Ambani, attached hereto as Exhibit 54.

188.    Further, Plaintiff informed his and Ambani's common counsel and accountant that he was unwilling to change the Bucks Entities from manager-managed to member-managed, and that he was concerned with Ambani's insistence for the proposed change.

189.    Displeased with Plaintiff's refusal to go along with his illegal schemes, Ambani and his cohorts resorted to coercing Plaintiff into signing the MOU by threatening him.

190.    Specifically, on June 21, 2016, Ambani, Sahil Ambani (Ambani's brother), and Prity Ambani (Ambani's wife) arrived at The Raven unannounced.

191.    After Ambani told Mrs. Ambani to wait in the dining room, he and his brother entered Plaintiff's office, without knocking, and closed the door behind them.

192.    When Plaintiff asked Ambani what was going on, Ambani told Plaintiff that he and his brother came to discuss the MOU and that Plaintiff needed to sign it immediately.

193.    Plaintiff, now realizing he was being physically threatened, reiterated that he could not sign the MOU because it would relinquish his control and put financial strain on the company.

194.    At this point, Ambani put his hands on the table, looked Plaintiff dead in the eye, and stated "if you don't sign the memorandum of understanding, we will have you removed *permanently*."

195.    Unsure if Ambani meant that Plaintiff would be removed as manager, or something more ominous, Plaintiff asked if Ambani was threatening him, to which Ambani replied, "It's not a threat, it's a fact."

196.     Ambani went on to say that "You will continue to make our loan payments the priority with these funds. There will be no restructuring."

197.     With that, Saumil and Sahil Ambani walked out of the office, leaving Plaintiff in a state of shock, physically ill, and with his hands shaking.

198.     Plaintiff feared – not only for his livelihood, reputation within the community, and the livelihood of his employees – but also for his personal safety and well-being.

199.     On June 22, 2016, out of duress – based on fear, as well as the dire need to meet employee payroll – Plaintiff signed the MOU.  *See* Ex. 50.

200.     Thereafter, Churchill continued to demand a capital call, despite not having the authority to initiate one.

201.     On June 28, 2016, Ambani changed his mind and was now in favor of a capital call.

202.     Accordingly, on June 30, 2016, Churchill sent another e-mail to Plaintiff demanding the unauthorized and illegal capital call.  *See* June 30th e-mail from Churchill, attached hereto as Exhibit 55.

203.     Further, on June 30, 2016, Ambani presented Plaintiff with a document titled "Memorandum for Record" ("MFR"), indicating that Plaintiff did not have $75,000 to contribute toward the unauthorized capital call, and that NHEI purportedly provided a capital call to Bucks Hospitality in the amount of $150,000.  A true and correct copy of the MFR is attached hereto as Exhibit 56.

204.     When Ambani presented Plaintiff with the MFR, he showed Plaintiff a bag purportedly filled with $150,000 of cash.  Plaintiff is not aware how much money was actually in the bag; nor does Plaintiff know how much, if any, of that money Ambani actually deposited into Bucks Hospitality's bank account.

205.    Further, like the MOU, Plaintiff initially refused to sign the MFR; that is until Churchill coerced Plaintiff into signing the MFR by throwing a tantrum in his office and screaming at him to sign it (with staff right outside the door) – then running out to her car immediately after Plaintiff signed it.

206.    On July 5, 2016, Ambani texted Plaintiff and stated he wanted to have "an emergency meeting about the compressor and other issues."

207.    Later that day, Ambani arrived at Plaintiff's office, with Churchill, and handed Plaintiff a letter purporting to remove Plaintiff as manager of the Buck Entities.  The July 1st letter (received by hand on July 5th from Ambani and Churchill) is attached hereto as Exhibit 57.

208.    At the same time Ambani handed Plaintiff the letter, he stated: "If you attempt to fight this I will ruin you. If you try to fight this with an attorney you will never win. You spend $10,000, I'll spend $20,000. You spend $50,000, I'll spend $100,000. You spend $100,000, I'll spend $200,000."  Ambani reiterated these exact words to the companies' accountant, Tom Hauke.

209.    In the letter, Ambani states that Plaintiff was being removed as manager pursuant to Section 5.3 of the operating agreements (see Ex. 23 and Ex. 24) due to "breach by Manager of his fiduciary duties."  See Ex. 57.

210.    The July 1st letter does not explain specifically what fiduciary duties Plaintiff owed and to whom, nor how Plaintiff supposedly breached those duties.  Id.  The letter further provides that Plaintiff will continue to be a member of both companies.  Id.

211.    The letter also states that Plaintiff was forbidden to return to the property (i.e., the property in which Plaintiff is a 50% owner).

212.     In other words, Ambani – a passive investor, whose primary business is tobacco wholesale,[5] with no experience in the hospitality and entertainment industries, and who provided no assistance in developing Plaintiff's ventures – unilaterally decided Plaintiff was not fulfilling his duties as manager of The Raven, and unilaterally decided to remove him as manager.

213.     Ambani's unilateral actions, however, were not authorized by the Bucks Entities' operating agreements because, pursuant to the provision cited by Ambani in his letter (§ 5.3), the only way to remove a manager is by: (1) holding a meeting called specifically for the purpose of removing a manager, with "a majority of the total number of Managers" present; or (2) pursuant to a written consent adopted pursuant to the operating agreement.  *See* Ex. 23, §§ 5.3 and 5.4.1.

214.     No meeting was held for the specific purpose of removing Plaintiff as manager, and no written consent to remove Plaintiff as manager was adopted.

215.     Further, because Plaintiff was the sole manager of the Bucks Entities, any decision to remove himself as manager would have had to been made by Plaintiff.  *Id.*, § 5.2.

216.     Nonetheless, on July 6, 2016, Ambani purportedly terminated Plaintiff for his alleged breach of fiduciary duty and cut off Plaintiff's salary.

217.     Ambani again threatened to have Plaintiff removed if Plaintiff did not leave the premises immediately.

218.     Also on July 6, 2016, Churchill sent an e-mail initiating two further capital calls, despite July and August being The Raven's busiest, most profitable, months – that is, despite not needing additional capital.

---

[5] *See* Ambani's 2013 tax return, attached hereto as Exhibit 58, p. 4 (listing principal business as "tobacco products wholesaler").

219.    On July 7, 2016, Plaintiff was removed from The Raven's bank accounts and denied access to its books and records.

220.    Also on July 7, 2016, all of Plaintiff's account passwords, e-mail passwords, bank login passwords, manager login passwords, point of sale passwords, merchant account passwords, and video security access passwords were changed by Churchill and Ambani. Churchill and Martinez signed into Plaintiff's e-mail account, and read and forwarded e-mail correspondence addressed to Plaintiff to their respective e-mail accounts. Similarly, Churchill and Ambani opened Plaintiff's mail as it came to The Raven, and never forwarded any of the mail to Plaintiff.

221.    On July 8, 2016, Churchill was introduced to staff as the new Director of Operations of The Raven, despite her not being paid through the company's payroll. *See* July 20, 2016 letter from Churchill, attached hereto as <u>Exhibit 59</u> (representing herself as Director of Business Operations).

222.    Also on July 8, 2016, Ambani fired one of The Raven's most important employees, Jeffrey Meier, who was instrumental in marketing and promoting The Raven, as well as managing the guest house – and who worked for no pay for several months and purchased over $11,000 of items for The Raven on his own personal credit card.

223.    The same day, Ambani hired a new manager who worked, and continues to work, for a direct competitor of The Raven (located across the street), Defendant Jose Armando Martinez.

224.    Mr. Martinez advertises the competitor's events on The Raven's Facebook page, to The Raven's mailing list, and directly to The Raven's clientele; and since Martinez began working for The Raven, The Raven's usual Friday and Saturday night traffic has migrated to the competitor and revenues have declined dramatically.

225.    Further, the competitor Martinez works for is owned by Mr. Dewitt (The Raven's former owner), which means that Mr. Dewitt is in violation of the NCA.  *See* Ex. 27.

226.    Martinez has hired key employees and talent away from The Raven to the competitor in violation of the NCA.

227.    On July 16, 2016, Meier sent Churchill an e-mail listing some of the over $11,000 of items he purchased for The Raven, for which he had yet to be reimbursed – which Churchill acknowledged.  *See* July 16, 2016 e-mail attached hereto as Exhibit 60.

228.    The same day, when Plaintiff entered property, he was accosted and again threatened with physical harm, this time by Martinez (at Ambani's direction over the phone).

229.    On July 31, 2016, Ambani, through Churchill, purportedly provided a capital call to Bucks Hospitality in the amount of $150,000.

230.    On August 15, 2016, Mr. Meier asked Martinez what the status was pertaining to the items he purchased for The Raven, in response to which: (1) Martinez stated to Churchill "what u wanna do? Good thing we changed the locks"; and (2) Churchill stated "We can stall him by telling him we will go over stuff…"  *See* e-mail correspondence, dated August 15, 2016, attached hereto as Exhibit 61.

231.    Despite the foregoing, on August 17, 2016, Mr. Meier received a letter from Ambani's attorney stating that Meier would not be reimbursed for over $11,000 of renovations to The Raven he paid for with his own personal credit card.  *See* August 17th letter (which was sent first class mail from Pennsylvania to New Jersey), attached hereto as Exhibit 62.

232.    On August 19, 2016, Jean Heath, manager at First National Bank of Newtown asked Plaintiff if Ambani was laundering money through The Raven's accounts after noticing irregular activity.  Ms. Heath had overseen The Raven's accounts for nearly 17 years.

233. On August 22, 2016, Plaintiff received a memo purporting to reduce his ownership in The Raven based on the unauthorized capital calls, which Plaintiff refused to execute.

234. Also on August 22, 2016, NHEI filed a complaint against Plaintiff in the Court of Common Pleas, Bucks County styled *NHEI v. Steven Lau*, No. 2016-05249, in which NHEI seeks, among others, a declaration from the court that (1) Plaintiff's ownership interest in the Bucks Entities has been reduced based on the illegal capital calls initiated by Churchill and Ambani; and (2) Plaintiff is not a member of the Bucks Entities. A true and correct copy of the complaint is attached hereto as Exhibit 63.

235. On August 26, 2016, despite not having the authority to enter into construction contracts, Ambani and Churchill requested an estimate for construction at The Raven; specifically, to dismantle and rebuild the extensive renovations that had just recently been completed.

236. On August 30, 2016, Ambani, through Churchill, purportedly provided a capital call to Bucks Hospitality in the amount of $150,000.

237. On September 2, 2016, during a hearing before the Unemployment Board, Ambani and Churchill testified, under oath, that Plaintiff is an owner of the Bucks Entities, and that Plaintiff had been terminated for purportedly breaching his fiduciary duty to the Bucks Entities.

238. On September 9, 2016, Plaintiff was denied unemployment benefits due to his being a 50% owner in Bucks Hospitality. *See* referee's decision, attached hereto as Exhibit 64.

239. Many employees are being paid in cash and are not on The Raven's payroll.

240. Further, since leaving The Raven, Plaintiff has received many reports of mismanagement, customer complaints (online complaints have skyrocketed), inconsistencies, bad food, loss of business to competitors, overcharging customers, faulty point of sale systems, essential bar equipment broken and in disrepair, broken heating and cooling systems for extended

periods of time, unlawful activity by management and staff, unpaid employees, unpaid independent contractors, unpaid invoices, and violations of LCB regulations.

241.    Additionally, without Plaintiff there to interfere with Defendants' fraud, Ambani and his cohorts have mismanaged and/or blatantly stolen from The Raven.

242.    For instance, in August of 2016, in preparation for his wedding, Ambani ordered about $7,000 worth of alcohol, through Bucks Hospitality's liquor license and by Martinez, for his wedding reception, which was in New Jersey – that is, for personal use.  *See* August 1, 2016 e-mail from Ambani to Martinez ordering alcohol, attached hereto as Exhibit 65.

243.    LCB regulations forbid purchasing alcohol under a business's liquor license for personal use.

244.    Not only did Ambani illegally order over $7,000 worth of alcohol for his wedding, and have it transported across state lines to New Jersey, he also never reimbursed Bucks Hospitality for the alcohol – that is, Ambani stole the alcohol.

245.    Further, on August 10, 2016 (which is The Raven's busiest time of year), Ambani reserved six rooms at The Raven for his wedding party.

246.    On September 9, 2016, Martinez forwarded Churchill an invoice in the amount of $2,472.12 for the rooms Ambani reserved.  *See* email correspondence attached hereto as Exhibit 66, pp. 1-2.  In response, Churchill told Martinez to "make it to say zero balance due."  *Id.*, p. 2. On September 12, Martinez responded to Churchill with a revised invoice that now reflected a zero balance, stating "[p]lease let me know if this works for you :)" *Id.* pp. 4-5.

247.    On September 14, 2016, Ambani submitted fraudulent documents to PNC Bank in connection with a merchant processing application and agreement, representing that he was the 100% owner of Bucks Hospitality. *See* PNC application, attached hereto as Exhibit 67, p. 1.

248.   Further, on September 15, 2016, First National Bank of Newtown – with whom The Raven had done its banking with for almost 17 years – closed the bank accounts of the Bucks Entities and Ferry Entities due to suspicious activity.

249.   On November 2, 2016, NHEI's counsel sent Plaintiff's counsel a letter requesting Plaintiff to make yet another illegal capital call to The Raven.  A true and correct copy of the November 2nd letter is attached hereto as Exhibit 68.

250.   In support of the unauthorized capital call, NHEI's counsel attached a budget for The Raven generated by Defendant Martinez.  *Id.* The budget fails to identify: (1) the May 19, 2016 cash injection by Ambani in the amount of $150,000, which a previous budget generated by Martinez, dated September 7, 2016, indicated was being paid back at $14,375 per month; (2) a $20,000 "personal loan" that was also listed on the September 7th budget; and (3) a $15,000 loan to NHEI that was likewise listed on the September 7th budget.  *Id.*

251.   In other words, the budget attached to the November 2nd letter is fraudulent.

252.   Further, based on the budget provided by NHEI's counsel, the monthly payments to NHEI/Ambani would increase from $38,000 to $68,357.56 – which means The Raven would now be paying Ambani $820,290.72 per year (despite generating $230,000–$260,000 of profit).

253.   Also on November 2, 2016, NHEI's counsel sent a letter to Plaintiff's counsel demanding that Plaintiff return a van that Ambani and Churchill are fully aware belongs to Plaintiff, and falsely accusing Plaintiff of interfering with The Raven's e-mail account, among others.  *See* November 2nd letter, attached hereto as Exhibit 69.

254.   On November 11, 2016, NHEI's counsel made another unauthorized and illegal capital call for The Raven.  *See* November 11th letter, attached hereto as Exhibit 70.

255.    On even date, NHEI's counsel sent another letter (attached hereto as <u>Exhibit 71</u>) falsely accusing Plaintiff of interfering with The Raven's e-mail account.  A week later, Martinez e-mailed Plaintiff stating that he had forgot his password (*i.e.*, admitting that Plaintiff had not interfered with the e-mail account).  *See* November 19th e-mail, attached hereto as <u>Exhibit 72</u>.

256.    Further – despite not being a Raven employee, much less an employee with the authority to sign checks – upon information and belief, Churchill regularly signs checks on behalf of Bucks Hospitality.  *See, e.g.*, check to Delaware River Towns Chamber of Commerce signed by Churchill, dated July 31, 2016 (mailed to New Jersey), attached hereto as <u>Exhibit 73</u>. (Plaintiff has not had access to Bucks Hospitality's books, records, and bank accounts since July 2016, and believes there are many examples of Churchill improperly, and without authority, signing checks on behalf of Bucks Hospitality.)

257.    Ambani is currently trying to sell The Raven without Plaintiff's consent, despite Plaintiff being a 50% member and owner of the Bucks Entities.

### FERRY STREET

258.    In furtherance of Ambani's and his cohorts' scheme to defraud Plaintiff and steal ***both*** of his business ventures, on May 22, 2016, Ambani unilaterally decided to halt the opening of The Salt House – even though it was a week from opening.  *See* May 22nd e-mail attached hereto as <u>Exhibit 74</u>.

259.    Thereafter, on July 1, 2016, Tollhouse's counsel sent Plaintiff a letter (via first class mail) purporting to remove Plaintiff as a member of the Ferry Entities for allegedly bringing "no value to this project."  A true and correct copy of the letter is attached hereto as <u>Exhibit 75</u>.

260.    Like the letter of even date purporting to remove Plaintiff as manager of the Bucks Entities (<u>Ex. 57</u>), the July 1st letter provided no explanation as to how Plaintiff brought no value to

the Ferry Street project.  *See* Ex. 75.  Indeed, the letter is about a half of a page, and consists of roughly 2.5 paragraphs.  *Id.*

261.    Further, despite Ferry Street (*i.e.*, The Salt House) having been close to opening, on or around July 6, 2016, Plaintiff arrived at the property for a scheduled meeting with a LCB agent and discovered that the locks had been changed.  Ambani unilaterally, and without notice to Plaintiff, changed the locks on the property, thereby denying Plaintiff access.

262.    Also on or about July 7, 2016, (1) Plaintiff was illegally removed as signatory on the bank accounts for the Ferry Entities by Ambani and Churchill; and (2) Plaintiff's passwords to online accounts were illegally changed by Ambani and Churchill.

263.    Until October 14, 2016, Plaintiff was unable to enter Ferry Street due to being illegally locked out by Ambani and Churchill.

264.    Churchill – who is not an employee of the Ferry Entities – has been fraudulently signing checks and acting on behalf of the Ferry Entities without Plaintiff's authorization.[6]

265.    Churchill has been fraudulently presenting herself as an employee and agent of the Ferry Entities to township officials without Plaintiff's authorization.

266.    Plaintiff has been illegally denied access to the books and records for the Ferry Entities by Ambani and Churchill.

267.    Ambani has also attempted to fraudulently amend the LCB application by falsely representing to the LCB that Plaintiff is not a member or owner of Ferry Hospitality.  *See* October 12, 2016 letter from the LCB, attached hereto as Exhibit 76 (stating that original application listed Ambani and Plaintiff as Hospitality's members, but that Tollhouse is now listed as sole member).

---

[6] Churchill appeared on The Raven's payroll for the first time during the week of November 28, 2016 (with a hire date of November 30, 2016), no doubt in response to Plaintiff's complaints of Raven employees being paid off-the-books.

268.     Further, on July 29, 2016, Tollhouse filed a complaint against Plaintiff in the Pennsylvania Court of Common Pleas, Bucks County, styled *Tollhouse v. Steven Lau*, No. 2016-04788, seeking a declaratory judgment from the court that Plaintiff is not a member of the Ferry Entities.   A true and correct copy of the complaint is attached hereto as Exhibit 77.   In the complaint, Tollhouse avers that Plaintiff is not a member of the Ferry Entities.   *Id.*, ¶¶ 25, 32.

269.     Additionally, Ambani submitted documents to the Internal Revenue Service falsely representing that Tollhouse is the sole member of the Ferry Entities. *See* October 26, 2016 letters from the IRS, attached hereto as Exhibit 78 (Ferry Holdings) and Exhibit 79 (Ferry Hospitality).

270.     On November 3, 2016, despite representing to the state court that Plaintiff is not a member of the Ferry Entities, Tollhouse's counsel sent Plaintiff's counsel a letter demanding a capital contribution from Plaintiff.   A true and correct copy of the letter is attached hereto as Exhibit 80.   According to the November 3rd letter, Ambani contributed $48,011 of cash to Ferry Hospitality. *Id.*   The budget documents supporting the unauthorized capital call are fraudulent. *Id.*

271.     In fact, NHEI's and Tollhouse's counsel has engaged in a letter-writing campaign filled with misrepresentations, falsehoods, and frivolous allegations designed to further Ambani's and his cohort's fraudulent scheme.

272.     For instance – after Plaintiff sent letters to Churchill and other employees of Ferry Street advising them that they were trespassing – on October 14, 2016, Tollhouse's counsel faxed, mailed, and e-mailed three letters to Chief Michael Cummings, Constable Frank DeLuca, and Plaintiff's counsel suggesting that Plaintiff did not have the right to send such a letter. *See* October 14th letters, attached hereto as Exhibit 81, Exhibit 82, and Exhibit 83.

273.     Further, on October 28, 2016, in Ambani's further efforts to intimidate and threaten Plaintiffs, Ambani caused Tollhouse to file a frivolous lawsuit against Plaintiff, Mr. DeLuca, and

Plaintiff's counsel alleging violations of 14 U.S.C. § 1983 and civil conspiracy.  *See* complaint, attached hereto as Exhibit 84.

274.    Moreover – despite Ambani and Tollhouse's counsel repeatedly representing that Plaintiff is not a member of the Ferry Entities – Tollhouse's counsel sent two letters requesting illegal capital calls from Plaintiff on November 3, 2016 (attached hereto as Exhibit 85) and November 11, 2016 (attached hereto as Exhibit 86).  *See also* e-mail from Ambani to Plaintiff, dated November 16, 2016, attached hereto as Exhibit 87) (admitting Plaintiff is a member of the Ferry Entities and requesting a capital contribution from Plaintiff).

275.    Finally, on or around October 13, 2016 – after receiving Plaintiff's letter regarding her trespassing on Ferry Street – Churchill approached Plaintiff in a threatening manner.  After stalking Plaintiff, as he tried to get away from her and ignore her, Churchill followed Plaintiff and directed threats at him in the presence of witnesses.

276.    Churchill then: (1) filed a false police report with the New Hope Police Department stating it was Plaintiff who threatened her; and (2) sent Plaintiff a letter documenting her fabricated version of events (a copy of which is attached hereto as Exhibit 88).

277.    The following morning (October 14, 2016), while Plaintiff was checking the Ferry Street property, he found Ambani waiting for Plaintiff in his car outside the building.  Ambani got out of his car, followed Plaintiff, and – in an attempt to further threaten and intimidate Plaintiff – stated "I started this and I am going to finish it. You are going to be sorry."

**E.    Ambani, with the help of his cohorts, has used the Venture Entities (and NHEI/Tollhouse) to carry out a pattern of racketeering activity, acquired and maintained an interest in the Venture Entities via a pattern of racketeering activity, and invested proceeds from racketeering activity into the Venture Entities (and NHEI/Tollhouse).**

278.     In light of the foregoing, it is evident that, from the outset, Ambani envisioned using Plaintiff's business ventures as a means of laundering Megawholesale's money – namely, proceeds from Megawholesale's off-the-books sales to its vendors, which includes, not only gross receipts and profits derived from such sales, but also taxes Megawholesale and Ambani avoided by not reporting such sales.

279.     Once it became clear that Plaintiff was unwilling to participate in Ambani's illegal activities, Ambani and his cohorts conspired to operate the Venture Entities and to steal the Venture Entities from Plaintiff through a pattern of racketeering activity; namely, extortion, money laundering, bank fraud, wire fraud, mail fraud, and access device fraud.

280.     Ambani and his cohorts: (1) participated in the Venture Entities', NHEI's, and Tollhouse's affairs through a pattern of racketeering activity; (2) acquired/maintained an interest in the Venture Entities through a pattern of racketeering activity; and (3) invested proceeds from racketeering activity into the Venture Entities, NHEI, and Tollhouse.

281.     Ambani's and his cohort's illegal behavior has exposed The Raven and Ferry Street – as well as Plaintiff's home and personal belonging – to potential ruin.

## ALLEGATIONS COMMON TO ALL RICO COUNTS

282.     At all times relevant to this Complaint, each of the following entities was an enterprise, as defined by 18 U.S.C. § 1961(4), which was engaged in, and its activities affected, interstate commerce: Bucks Resort, Bucks Hospitality, Ferry Holdings, Ferry Hospitality, NHEI, and Tollhouse.

283.     The substantial amount of cash referenced throughout this Complaint, which Ambani injected into, and removed from, Bucks Hospitality and Ferry Hospitality, represents proceeds from unlawful activity.

284.     The cash that Ambani injected into, and removed from, Bucks Hospitality and Ferry Hospitality represents proceeds from Ambani's "cash investment network," as well as proceeds from Megawholesale's off-the-books sales to its vendors, which includes, not only gross receipts and profits derived from such sales, but also taxes Megawholesale and Ambani avoided by not reporting such sales.

285.     Defendants knew that the cash Ambani injected into, and removed from, Bucks Hospitality and Ferry Hospitality were proceeds from unlawful activity.

286.     The financial transactions engaged in by Ambani and Defendants were conducted with the intent to carry on an unlawful activity, and/or with the intent to violate 26 U.S.C. § 7201.

287.     The financial transactions engaged in by Ambani and Defendants were conducted knowing that the transactions were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds from an unlawful activity, and/or to avoid a transaction reporting requirement under state or federal law.

288.     The illegal nature of the cash Ambani injected into Bucks Hospitality and Ferry Hospitality is evidenced by the gross disparity between the voluminous amounts of cash he has as compared with the few liquid assets he reports.  *See* Ex. 14, Ex. 16, and Ex. 17.

289.     The pattern of racketeering engaged in by Defendants involved a scheme to defraud, extort, and steal from Plaintiff, individually and derivatively on behalf of the Venture Entities – as well as launder proceeds from unlawful activity – carried out since around March of 2015 to the present and continuing, include, among others:

(a)     laundering over $1,500,000 of proceeds from unlawful activity through Bucks Hospitality and Ferry Hospitality since March of 2015, in violation of 18 U.S.C. §§ 1956-1957, by making several, substantial cash deposits into those entities, then dispersing

the amounts back to Ambani (via NHEI and Tollhouse) as interest/loan payments that greatly exceeded any profits generated by the entities (Ex. 34);

(b)     Ambani's and Churchill's threatening Plaintiff so that he would sign the MOU (Ex. 50), thereby relinquishing his role as manager of the Bucks Entities, in violation of 18 U.S.C. § 1951;

(c)     Churchill's threatening Plaintiff so that he would sign the MFR (Ex. 56), in violation of 18 U.S.C. § 1951;

(d)     when Plaintiff refused to sign the MOU, Saumil Ambani's, Sahil Ambani's, and Prity Ambani's, arriving unannounced at The Raven, during which time, Saumil Ambani threatened to remove Plaintiff "permanently" if he did not sign the MOU, in violation of 18 U.S.C. § 1951;

(e)     Ambani's and Martinez's threatening Plaintiff on two other occasions for being on The Raven property, in violation of 18 U.S.C. § 1951;

(f)     Sending interstate e-mail correspondence in furtherance of Defendants' conspiracy, in violation of 18 U.S.C. § 1343 (*see* Ex. 9, Ex. 10, Ex. 51–Ex. 55, Ex. 60, Ex. 61, Ex. 61, Ex. 66, Ex. 68, Ex. 70–Ex. 72, Ex. 74, Ex. 80, Ex. 85–Ex. 87, and Ex. 90).[7]

(g)     Making an interstate wire transfer between Kothari and Ambani/NHEI in the amount of $150,000, pursuant to the Note (Ex. 31), which was subsequently wired to Bucks Hospitality (Ex. 32), in violation of 18 U.S.C. § 1343 and 18 U.S.C. §§ 892-893;

(h)     Making wire transfers from NHEI that were funded by unreported income from Megawholesale, in violation of 18 U.S.C. § 1343 and 18 U.S.C. §§ 892-893;

---

[7] Exhibit 90 is a letter sent by defense counsel, dated November 28, 2016, in which defense counsel disseminates falsehoods about Plaintiff that originated from Martinez.

(i)     Saumil Ambani's, Sahil Ambani's, and Churchill's using threats to ensure that monthly payments of $38,000 would continue to be paid to NHEI despite Plaintiff's objections, in violation of 18 U.S.C. § 894;

(j)     Ambani's and Sahil Ambani's submitting false information during the SBA loan application process (and in other submissions), in violation of 18 U.S.C. § 1344, such as (i) their personal financial statements, which severely underreport their liquid assets (Ex. 14, Ex. 15, Ex. 16); (ii) Ambani's tax returns, which failed to report taxable income he received from his tobacco businesses, including Megawholesale (Ex. 18, Ex. 19); (iii) Ambani's residential loan application, stating he had substantially more liquid assets than he represents in his financial statements (Ex. 17); and (iv) a document submitted by Ambani to the SBA representing that the source of his funds was from three years of personal savings (Ex. 20), which is belied by his personal financial statements;

(k)     Ambani's submitting false information to PNC Bank, in violation of 18 U.S.C. § 1344, representing that he is 100% owner of Bucks Hospitality (Ex. 67);

(l)     Ambani's counsel's committing mail fraud on behalf of Ambani in violation of 18 U.S.C. §§ 1341 and 1952, in which counsel purported to remove Plaintiff as a member of the Ferry Entities, despite Ambani's not having the authority to do so (Ex. 75);

(m)     Ambani's committing mail fraud in violation of 18 U.S.C. §§ 1341 and 1952, by submitting documents to the IRS representing that the only member of the Ferry Entities is Tollhouse (Ex. 78, Ex. 79);

(n)     Ambani's committing mail fraud in violation of 18 U.S.C. §§ 1341 and 1952, by submitting documents to the LCB representing that the only member of Ferry Hospitality is Tollhouse (Ex. 76);

(o)   Churchill's committing mail fraud, in violation of 18 U.S.C. §§ 1341 and 1952, in representing that she is Director of Business Operations for The Raven, when she is not even on The Raven's payroll (Ex. 59);

(p)   Churchill's committing mail fraud, in violation of 18 U.S.C. §§ 1341 and 1952, in representing to the New Hope Borough Police that Plaintiff threatened Churchill, when in fact, it was Churchill who approached and threatened Plaintiff (Ex. 88);

(q)   Churchill's committing mail fraud, in violation of 18 U.S.C. §§ 1341 and 1952, in representing to the Delaware River Towns Chamber of Commerce that she has authority to sign checks on behalf of Bucks Hospitality when she does not (Ex. 73);

(r)   mail fraud committed on Tollhouse's and NHEI's behalf, in violation of 18 U.S.C. §§ 1341 and 1952, in sending multiple letters devoid of factual or legal basis in furtherance of Defendants' fraudulent scheme (*see* Ex.62, Ex. 69, Ex. 81–Ex. 83, and Ex. 90);

(s)   Ambani's and Churchill's obstructing official proceedings before the Unemployment Board, LCB, and IRS, in violation of 18 U.S.C. § 1512 (*see* Ex. 64);

(t)   Ambani's and Churchill's committing fraud in connection with the Venture Entities' bank accounts, books and records, and Plaintiff's e-mail accounts – and denying Plaintiff access to same – in violation of 18 U.S.C. § 1029 (*see* Ex. 67 and ¶¶ 219-220, 262);

(u)   Ambani's and Megawholesale's trafficking in contraband cigarettes, in violation of 18 U.S.C. §§ 2341-2346 (*see* Ex. 49);

(v)   usurious lending practices (including exorbitant and illegal interest payments), enforced by extortion, in furtherance of Defendants' unlawful scheme; and

48

(w)     Ambani, Churchill, and Martinez conspiring, and carrying out, a scheme to steal from The Raven (and for The Raven), such as by: (i) voiding a $2,472.12 bill Ambani owed for renting rooms for his wedding (Ex. 66); (ii) stealing $7,000 of alcohol from The Raven and shipping it across state lines to a wedding venue in New Jersey, in violation of 18 U.S.C. §§ 2314-2315 (and LCB regulations) (Ex. 65); and (iii) stealing over $11,000 worth of goods paid for by Jeffrey Meier (Ex. 60–Ex. 62).

## COUNT I
## RICO VIOLATION (§ 1962(c))
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count I Defendants"))**

290.    Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

291.    Each of the named Count I Defendants participated in the conduct of the Venture Entities' affairs, by, among others, engaging in transactions constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  *See* ¶ 289.

292.    The pattern of racketeering activity in which the Count I Defendants engaged involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

293.     The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Venture Entities – as described in detail in the Complaint and accompanying exhibits.

294.     The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count I Defendants' scheme to defraud Plaintiff of his ownership interest in the Venture Entities and the rights and benefits afforded to him as a 50% owner of the Venture Entities.

295.     As a result of the pattern of racketeering activity, Plaintiff and the Venture Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count I Defendants, and each of them, jointly and severally, for:

(a)     An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)     Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)     Such other relief as the Court deems just and proper.

**COUNT II**
**RICO VIOLATION (§ 1962(d))**
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count II Defendants"))**

296.     Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

297.     From around March 2015 to present, the Count II Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other,

and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Venture Entities, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). *See* ¶ 289.

298.   The pattern of racketeering activity in which the Count II Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

299.   The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Venture Entities – as described in detail in the Complaint and accompanying exhibits.

300.   The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count II Defendants' scheme to defraud Plaintiff of his ownership interest in the Venture Entities and the rights and benefits afforded to him as a 50% owner of the Venture Entities.

301.   As a result of the pattern of racketeering activity, Plaintiff and the Venture Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count II Defendants, and each of them, jointly and severally, for:

(a)     An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)     Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)     Such other relief as the Court deems just and proper.

## COUNT III
## RICO VIOLATION (§ 1962(c))
**(Plaintiff, individually and derivatively on behalf of the Bucks Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count III Defendants"))**

302.    Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

303.    Each of the named Count III Defendants participated in the conduct of NHEI's affairs, by, among others, engaging in transactions constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  *See* ¶ 289.

304.    The pattern of racketeering activity in which the Count III Defendants engaged involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

305.    The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Bucks Entities – as described in detail in the Complaint and accompanying exhibits.

306.    The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count III Defendants' scheme to defraud Plaintiff of his ownership interest in the Bucks Entities and the rights and benefits afforded to him as a 50% owner of the Bucks Entities.

307.    As a result of the pattern of racketeering activity, Plaintiff and the Bucks Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Bucks Entities, demands judgment against the Count III Defendants, and each of them, jointly and severally, for:

(a)    An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)    Such other relief as the Court deems just and proper.

### COUNT IV
### RICO VIOLATION (§ 1962(d))
**(Plaintiff, individually and derivatively on behalf of the Bucks Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count IV Defendants"))**

308.    Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

309.    From around March 2015 to present, the Count IV Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other,

and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of NHEI, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  *See* ¶ 289.

310.    The pattern of racketeering activity in which the Count IV Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

311.    The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Bucks Entities – as described in detail in the Complaint and accompanying exhibits.

312.    The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count IV Defendants' scheme to defraud Plaintiff of his ownership interest in the Bucks Entities and the rights and benefits afforded to him as a 50% owner of the Bucks Entities.

313.    As a result of the pattern of racketeering activity, Plaintiff and the Bucks Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Bucks Entities, demands judgment against the Count IV Defendants, and each of them, jointly and severally, for:

(a)    An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)    Such other relief as the Court deems just and proper.

## COUNT V
## RICO VIOLATION (§ 1962(c))
**(Plaintiff, individually and derivatively on behalf of the Ferry Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count V Defendants"))**

314.    Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

315.    Each of the named Count V Defendants participated in the conduct of Tollhouse's affairs, by, among others, engaging in transactions constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). *See* ¶ 289.

316.    The pattern of racketeering activity in which the Count V Defendants engaged involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

317.    The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Ferry Entities – as described in detail in the Complaint and accompanying exhibits.

318.    The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count V Defendants' scheme to defraud Plaintiff of his ownership interest in the Ferry Entities and the rights and benefits afforded to him as a 50% owner of the Ferry Entities.

319.    As a result of the pattern of racketeering activity, Plaintiff and the Ferry Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Ferry Entities, demands judgment against the Count V Defendants, and each of them, jointly and severally, for:

(a)    An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)    Such other relief as the Court deems just and proper.

### COUNT VI
### RICO VIOLATION (§ 1962(d))
**(Plaintiff, individually and derivatively on behalf of the Ferry Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count VI Defendants"))**

320.    Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

321.    From around January 2016 to present, the Count VI Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other,

and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of Tollhouse, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  *See* ¶ 289.

322.    The pattern of racketeering activity in which the Count VI Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346)  – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

323.    The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Ferry Entities – as described in detail in the Complaint and accompanying exhibits.

324.    The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count VI Defendants' scheme to defraud Plaintiff of his ownership interest in the Ferry Entities and the rights and benefits afforded to him as a 50% owner of the Ferry Entities.

325.    As a result of the pattern of racketeering activity, Plaintiff and the Ferry Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Ferry Entities, demands judgment against the Count VI Defendants, and each of them, jointly and severally, for:

(a)  An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)  Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)  Such other relief as the Court deems just and proper.

## COUNT VII
### RICO VIOLATION (§ 1962(c))
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count VII Defendants"))**

326.  Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

327.  At all times relevant to this Complaint, the Count VII Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce.  Each of these the Count VII Defendants participated in the operation and management of the enterprise.

328.  In addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity.

329.  The Count VII Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  *See* ¶ 289.

330.    The pattern of racketeering activity in which the Count VII Defendants engaged involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

331.    The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Venture Entities – as described in detail in the Complaint and accompanying exhibits.

332.    The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count VII Defendants' scheme to defraud Plaintiff of his ownership interest in the Venture Entities and the rights and benefits afforded to him as a 50% owner of the Venture Entities.

333.    The Count VII Defendants knowingly and intentionally engaged in the predicate acts constituting the pattern of racketeering activity.

334.    As a result of the pattern of racketeering activity, Plaintiff and the Venture Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count VII Defendants, and each of them, jointly and severally, for:

    (a)    An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

    (b)    Plaintiff's reasonable attorneys' fees, expenses, and costs; and

    (c)    Such other relief as the Court deems just and proper.

## COUNT VIII
## RICO VIOLATION (§ 1962(d))
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count VIII Defendants"))**

335.    Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

336.    At all times relevant to this Complaint, the Count VIII Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce.

337.    From around March 2015 to present, the Count VIII Defendants did unlawfully, knowingly and intentionally combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the association-in-fact enterprise's affairs through a pattern of racketeering activity violation of 18 U.S.C. § 1962(d). *See* ¶ 289.

338.    The pattern of racketeering activity in which the Count VIII Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits

constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

339.    The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Venture Entities – as described in detail in the Complaint and accompanying exhibits.

340.    The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count VIII Defendants' scheme to defraud Plaintiff of his ownership interest in the Venture Entities and the rights and benefits afforded to him as a 50% owner of the Venture Entities.

341.    As a result of the pattern of racketeering activity, Plaintiff and the Venture Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count VIII Defendants, and each of them, jointly and severally, for:

(a)    An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)    Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)      Such other relief as the Court deems just and proper.

## COUNT IX
## RICO VIOLATION (§ 1962(b))
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count IX Defendants"))**

342.     Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

343.     As alleged in the foregoing paragraphs, Ambani/NHEI acquired or maintained, directly or indirectly, an interest in, and/or control of, the Venture Entities through a pattern of racketeering activity engaged in by the Count IX Defendants in violation of 18 U.S.C. § 1962(b). *See* ¶ 289.

344.     The pattern of racketeering activity in which the Count IX Defendants engaged involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

345.     The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Venture Entities – as described in detail in the Complaint and accompanying exhibits.

346.     The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count IX Defendants' scheme to defraud Plaintiff of his ownership interest in the Venture Entities and the rights and benefits afforded to him as a 50% owner of the Venture Entities.

347.     As a result of the pattern of racketeering activity, Plaintiff and the Venture Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count IX Defendants, and each of them, jointly and severally, for:

(a)     An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)     Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)     Such other relief as the Court deems just and proper.

## COUNT X
## RICO VIOLATION (§ 1962(d))
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count X Defendants"))**

348.     Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

349.     From around March 2015 to present, the Count X Defendants did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, to assist Ambani/NHEI in acquiring or maintaining an interest in, and/or control of, the Venture Entities through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). *See* ¶ 289.

350.    The pattern of racketeering activity in which the Count X Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

351.    The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Venture Entities – as described in detail in the Complaint and accompanying exhibits.

352.    The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count X Defendants' scheme to defraud Plaintiff of his ownership interest in Bucks Resort and the rights and benefits afforded to him as a 50% owner of the Venture Entities.

353.    As a result of the pattern of racketeering activity, Plaintiff and the Venture Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count X Defendants, and each of them, jointly and severally, for:

(a)     An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)     Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)     Such other relief as the Court deems just and proper.

### COUNT XI
### RICO VIOLATION (§ 1962(a))
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count XI Defendants"))**

354.    Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

355.    Each of the named Count XI Defendants, as alleged in the foregoing paragraphs, invested, or assisted other Count XI Defendants in investing (directly or indirectly), proceeds from a pattern of racketeering activity into the Venture Entities.  *See* ¶ 289.

356.    The pattern of racketeering activity in which the Count XI Defendants engaged involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346) − all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

357.    The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as

extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Venture Entities – as described in detail in the Complaint and accompanying exhibits.

358.   The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count XI Defendants' scheme to defraud Plaintiff of his ownership interest in the Venture Entities and the rights and benefits afforded to him as a 50% owner of the Venture Entities.

359.   As a result of the pattern of racketeering activity, Plaintiff and the Venture Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count XI Defendants, and each of them, jointly and severally, for:

(a)   An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)   Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)   Such other relief as the Court deems just and proper.

### COUNT XII
### RICO VIOLATION (§ 1962(d))
**(Plaintiff, individually and derivatively on behalf of Bucks Hospitality v. the Individual Defendants and Ambani Entities (collectively, the "Count XII Defendants"))**

360.   Plaintiff incorporates herein by reference the allegations contained in all the above paragraphs as though set forth in their entirety.

361.   From around March 2015 to present, the Count XII Defendants did unlawfully, knowingly and intentionally combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to invest, or to assist other Count XII

66

Defendants in investing (directly or indirectly), proceeds from a pattern of racketeering activity into the Venture Entities in violation of 18 U.S.C. § 1962(d).  *See* ¶ 289.

362.    The pattern of racketeering activity in which the Count XII Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. §§ 1341 and 1952); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); extortion (18 U.S.C. § 1951); money laundering (18 U.S.C. §§ 1956-1957); extortionate extensions of credit (18 U.S.C. §§ 892-894); obstruction of official proceedings (18 U.S.C. § 1512); transportation and receipt of stolen property (18 U.S.C. §§ 2314-2315); fraud in connection with access devices (18 U.S.C. § 1029); and trafficking in contraband cigarettes (18 U.S.C. §§ 2341-2346)  – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

363.    The predicate acts of mail fraud, wire fraud, and bank fraud involved mailings and wire transfers of funds that were being: (1) laundered in connection with substantial amounts of unreported cash from Ambani's tobacco business and "cash investment network"; (2) used as extortionate extensions of credit; and (3) misappropriated from Plaintiff and the Venture Entities – as described in detail in the Complaint and accompanying exhibits.

364.    The predicate acts of mail fraud, wire fraud, and bank fraud also involved the transmission and use of false documentation in furtherance of the Count XII Defendants' scheme to defraud Plaintiff of his ownership interest in the Venture Entities and the rights and benefits afforded to him as a 50% owner of the Venture Entities.

365.    As a result of the pattern of racketeering activity, Plaintiff and the Venture Entities have suffered damage to their business and property.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count XII Defendants, and each of them, jointly and severally, for:

(a)     An award of compensatory damages in an amount in excess of the jurisdictional amount of $150,000, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(b)     Plaintiff's reasonable attorneys' fees, expenses, and costs; and

(c)     Such other relief as the Court deems just and proper.

<u>**COUNT XIII**</u>
<u>**BREACH OF FIDUCIARY DUTY**</u>
**(Plaintiff, individually and derivatively on behalf of the Bucks Entities v. NHEI)**

366.     Plaintiff incorporates by reference the above paragraphs of this Complaint as if fully set forth at length.

367.     NHEI, a 50% owner and member of the Bucks Entities, owes a fiduciary duty, including the duty of loyalty, duty of care, and the duty of good faith and fair dealing, to Plaintiff as the other 50% owner and member, which includes the duty to act fairly to Plaintiff and not "freeze" him out of his ownership interests and/or benefits to which he is entitled as an owner of the Bucks Entities, including any profits realized by the Bucks Entities.

368.     Instead of acting in good faith and in a manner that does not oppress Plaintiff, NHEI has engaged in a course of conduct calculated to oppress and harass Plaintiff and squeeze him out of the Bucks Entities.

369.     NHEI, acting through Ambani, has done this by, among other things, (i) preventing Plaintiff from participating in decisions relating to the management and operations of the Bucks Entities; (ii) intentionally engaging in a course of conduct designed to minimize profits of the Bucks Entities; (iii) diverting the Bucks Entities' opportunities; and (iv) otherwise depriving Plaintiff of all of the rights and benefits afforded to him as a 50% owner of the Bucks Entities.

370.    The conduct of NHEI was, and continues to be, extreme, outrageous, and malicious, and warrants the imposition of punitive damages.

371.    Plaintiff has and continues to suffer damages and irreparable harm as a result of the conduct of NHEI's actions.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Bucks Entities, demands judgement against NHEI as follows:

(a)    An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)    An award of punitive damages; and

(c)    Such other relief as the Court deems just and proper.

<u>**COUNT XIV**</u>
<u>**BREACH OF FIDUCIARY DUTY**</u>
**(Plaintiff, individually and derivatively on behalf of the Ferry Entities v. Tollhouse)**

372.    Plaintiff incorporates by reference the above paragraphs of this Complaint as if fully set forth at length.

373.    Tollhouse, a 50% owner and member of the Ferry Entities, owes a fiduciary duty, including the duty of loyalty, duty of care, and the duty of good faith and fair dealing, to Plaintiff as the other 50% owner and member, which includes the duty to act fairly to Plaintiff and not "freeze" him out of his ownership interests and/or benefits to which he is entitled as an owner of the Ferry Entities, including any profits realized by the Ferry Entities.

374.    Instead of acting in good faith and in a manner that does not oppress Plaintiff, Tollhouse has engaged in a course of conduct calculated to oppress and harass Plaintiff and squeeze him out of the Ferry Entities.

375.    Tollhouse, acting through Ambani, has done this by, among other things, (i) preventing Plaintiff from participating in decisions relating to the management and operations of the Ferry Entities; (ii) intentionally engaging in a course of conduct designed to minimize profits of the Ferry Entities; (iii) diverting the Ferry Entities' opportunities; and (iv) otherwise depriving Plaintiff of all of the rights and benefits afforded to him as a 50% owner of the Ferry Entities.

376.    The conduct of Tollhouse was, and continues to be extreme, outrageous, and malicious, and warrants the imposition of punitive damages.

377.    Plaintiff has and continues to suffer damages and irreparable harm as a result of Tollhouse's actions.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Ferry Entities, demands judgement against Tollhouse as follows:

(a)     An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)     An award of punitive damages; and

(c)     Such other relief as the Court deems just and proper.

**COUNT XV**
**FRAUD**
**(Plaintiff, individually and derivatively on behalf of Venture Entities v. Ambani)**

378.    Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

379.     Ambani has made misrepresentations of material facts, deliberately concealed, and omitted to disclose material facts that he had a duty to disclose in connection with his dealings with Plaintiff, and engaged in other conduct which amounts to a scheme to defraud Plaintiff, including, among other things, the conduct set forth in paragraph 289, above.

380.   Ambani's misrepresentations, omissions, concealment of material facts, and scheme and artifices to defraud were made and undertaken intentionally or recklessly for the purpose of benefiting himself economically and harming Plaintiff.

381.   Plaintiff reasonably and justifiably relied to his detriment on the truthfulness of Ambani's representations, on the completeness of his disclosures of material facts and without knowledge of his scheme and artifice to defraud them.

382.   Ambani knew, or should have known, that Plaintiff would so rely and intended that they so rely.  But for Ambani's misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiff would not have continued their dealings and transactions with Ambani.

383.   Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that Ambani was engaged in misrepresentations, omissions, and fraudulent conduct.

384.   As a direct and proximate cause of Ambani's misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by Plaintiff has been damaged, and because Ambani's conduct was knowing, intentional, willful, wanton and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgement against Ambani as follows:

(a)   An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)   An award of punitive damages; and

(c)   Such other relief as the Court deems just and proper.

**COUNT XVI**
**CIVIL CONSPIRACY**
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual**
**Defendants and Ambani Entities (collectively, the "Count XVI Defendants"))**

385.    Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

386.    During the relevant time period, the Count XVI Defendants, either directly or indirectly, combined or agreed with intent to defraud, deceive, divert and misappropriate assets, resources, personnel, property and business opportunities of Plaintiff's, individually and derivatively on behalf of the Venture Entities by unlawful means, including, among other things, common law fraud, breach of fiduciary duty, and conversion.

387.    At all relevant times the Count XVI Defendants acted with intent to cause damages to Plaintiff and the Venture Entities by defrauding, diverting and taking the property, assets, resources and opportunities from Plaintiff and the Venture Entities.

388.    To the extent that certain of the Count XVI Defendants worked for the Venture Entities, their intent to cause damage to the Venture Entities was not justified.

389.    The Count XVI Defendants did, in fact, carry out their conspiracy by, among others, mail fraud, wire fraud, bank fraud, money laundering, extortion, common law fraud, breach of fiduciary duty, and conversion.

390.    As a result of the Count XVI Defendants' unlawful acts, using unlawful means, Plaintiff and the Venture Entities have suffered damages.

391.    The Count XVI Defendants' unlawful acts using unlawful means were the proximate cause of the damages to Plaintiff and the Venture Entities.

392.     To the extent that the Count XVI Defendants' conspiracy was done knowingly, intentionally, willfully, wantonly, and recklessly, Plaintiff and the Venture Entities are entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgement against the Count XVI Defendants, each of them, jointly and severally, as follows:

(a)     An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)     An award of punitive damages; and

(c)     Such other relief as the Court deems just and proper.

## COUNT XVII
## UNJUST ENRICHMENT
**(Plaintiff, derivatively on behalf of the Venture Entities v. Ambani, NHEI, and Tollhouse)**

393.     Plaintiff incorporates by reference the above paragraphs of this Complaint as if fully set forth at length.

394.     Ambani, NHEI, and Tollhouse have obtained benefits to which they are not entitled, including, purportedly, Plaintiff's 50% ownership interests in the Venture Entities, and all of the rights and benefits afforded to Plaintiff as a 50% owner of those companies.

395.     Ambani has also improperly obtained such benefits as free rooms at The Raven during its busiest time of year (Ex. 66), and $7,000 worth of free alcohol (Ex. 65).

396.     Ambani, NHEI, and Tollhouse have been solely enriched by their actions at the expense of the Venture Entities.

397.    It would be inequitable for Ambani, NHEI, and Tollhouse to retain the improperly obtained benefits.

**WHEREFORE**, Plaintiff, derivatively on  behalf of the Venture Entities, demands judgment against Ambani, NHEI, and Tollhouse, each of them, jointly and severally,  as follows:

(a)    An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)    An order (i) imposing a constructive trust on all money and property that Ambani, has improperly diverted to himself, his family, and others, and to third party entities in which he holds an ownership interest; and (ii) requiring Ambani, NHEI, and Tollhouse to disgorge all such money and property; and

(c)    Any such further and additional relief as the Court deems just and appropriate under the circumstances.

## <u>COUNT XVIII</u>
## <u>UNJUST ENRICHMENT</u>
### (Plaintiff v. the Venture Entities, Ambani, NHEI, and Tollhouse)

398.    Plaintiff incorporates by reference the above paragraphs of this Complaint as if fully set forth at length.

399.    The Venture Entities, Ambani, NHEI, and Tollhouse have obtained benefits to which they are not entitled, namely in the depositing and keeping of the monies due and owing to Plaintiff as a 50% owner of the Venture Entities.

400.    Despite Plaintiff's continued and repeated demands for monies due and owing to him, the Venture Entities, Ambani, NHEI, and Tollhouse have and continue to refuse Plaintiff's demands.

401.     The Venture Entities, Ambani, NHEI, and Tollhouse have been solely enriched by their actions at the expense of Plaintiff.

402.     It would be inequitable for the Venture Entities, Ambani, NHEI, and Tollhouse to retain the improperly obtained benefits.

**WHEREFORE**, Plaintiff demands judgment against the Venture Entities, Ambani, NHEI, and Tollhouse, each of them, jointly and severally, as follows:

(a)     An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)     An order requiring the Venture Entities, Ambani, NHEI, and Tollhouse to disgorge all such money and property; and

(c)     Any such further and additional relief as the Court deems just and appropriate under the circumstances.

## COUNT XIX
## CONVERSION
**(Plaintiff, individually and derivatively on behalf of the Bucks Entities v. Ambani and NHEI)**

403.     Plaintiff incorporates by reference the above paragraphs of this Complaint as if fully set forth at length.

404.     During the relevant time period, Ambani and NHEI diverted the assets, resources, property, and business opportunities of Plaintiff and the Bucks Entities without justification.

405.     Ambani and NHEI intended to possess and permanently deprive Plaintiff and the Bucks Entities of such assets, resources, property, and business opportunities.

406.     As a result of the aforementioned conduct, Plaintiff and the Bucks Entities have been permanently deprived of their respective rights to those assets, resources, property, and business opportunities.

407.    The unlawful acts of Ambani and NHEI were the proximate cause of the damages sustained by Plaintiff and the Bucks Entities.

408.    The conduct of Ambani and NHEI was, and continues to be, extreme, outrageous, and malicious, and warrants the imposition of punitive damages.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Bucks Entities, demands judgement against Ambani and NHEI, jointly and severally, as follows:

(a)    An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)    An award of punitive damages; and

(c)    Such other relief as the Court deems just and proper.

## COUNT XX
## CONVERSION
**(Plaintiff, individually and derivatively on behalf of the Ferry Entities v. Ambani and Tollhouse)**

409.    Plaintiff incorporates by reference the above paragraphs of this Complaint as if fully set forth at length.

410.    During the relevant time period, Ambani and Tollhouse diverted the assets, resources, property, and business opportunities of Plaintiff and the Ferry Entities without justification.

411.    Ambani and Tollhouse intended to possess and permanently deprive Plaintiff and the Ferry Entities of such assets, resources, property, and business opportunities.

412.    As a result of the aforementioned conduct, Plaintiff and the Ferry Entities have been permanently deprived of their respective rights to those assets, resources, property, and business opportunities.

413.    The unlawful acts of Ambani and Tollhouse were the proximate cause of the damages sustained by Plaintiff and the Ferry Entities.

414.    The conduct of Ambani and Tollhouse was, and continues to be, extreme, outrageous, and malicious, and warrants the imposition of punitive damages.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Ferry Entities, demands judgement against Ambani and Tollhouse, jointly and severally, as follows:

(a)    An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)    An award of punitive damages; and

(c)    Such other relief as the Court deems just and proper.

## COUNT XXI
## REQUEST FOR INSPECTION OF CORPORATE BOOKS & RECORDS
### (Plaintiff v. the Venture Entities)

415.    Plaintiff incorporates by reference the above paragraphs of this Complaint as if fully set forth at length.

416.    As a fifty-percent (50%) member of each of the Venture Entities, Plaintiff is entitled to, and hereby demands, an inspection of the corporate books and records, as well as the production of all meeting minutes, agendas, corporate minutes, work papers, financial statements, and tax returns, from April 2016 to present.

417.    Plaintiff has made demands on the Venture Entities, which have set forth the proper purpose for his request.

418.    To date, the Venture Entities have failed to fully comply with Plaintiff's request.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Venture Entities as follows:

(a)    An order granting Plaintiff's request for inspection of the corporate books and records; and

(b)    Any such further and additional relief as the Court deems just and appropriate under the circumstances.

**COUNT XXII**
**TORTIOUS INTERFERENCE WITH EXISTING AND**
**PROSPECTIVE CONTRACTUAL RELATIONS**
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count XXII Defendants"))**

419.    Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

420.    The acts and omissions of the Count XXII Defendants constitute a tortious interference with Plaintiff's and the Venture Entities' business relationship with, among others, the Venture Entities' employees, agents, subcontractors, contractors, and/or patrons.

421.    This interference was done without justification and with an improper and unacceptable motive.

422.    Based on the evidence available to this date, the Count XXII Defendants' tortious conduct has also interfered with Plaintiff's prospective business relationships with others.

423.    The acts of the Count XXII Defendants were intentional, malicious, inconspicuous, outrageous, and/or grossly reckless.

424.    As a direct result of the interference, Plaintiff and the Venture Entities have incurred damage, including loss of profits, loss of business, loss of future profits, and costs, the extent of which, to date, is unknown.

425.    To the extent that the Count XXII Defendants' conduct was done knowingly, intentionally, willfully, wantonly, maliciously, and recklessly, Plaintiff and the Venture Entities are entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count XXII Defendants, each of them, jointly and severally, as follows:

(a)    An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)    An award of punitive damages; and

(c)    Such other relief as the Court deems just and proper.

## COUNT XXIII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. the Individual Defendants and Ambani Entities (collectively, the "Count XXIII Defendants"))**

426.    Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

427.    As a 50% member of the Bucks Entities (with whom Plaintiff was also a 50% member) NHEI owed a fiduciary duty of care, candor, and loyalty to Plaintiff, including, among others, not to engage in acts amounting to extortion, diversion of business opportunities, theft, conversion of property, fraud, and money laundering.

428.    Further, as a 50% member of the Ferry Entities (with whom Plaintiff was also a 50% member) Tollhouse likewise owed a fiduciary duty of care, candor, and loyalty to Plaintiff, including, among others, not to engage in acts amounting to extortion, diversion of business opportunities, theft, conversion of property, fraud, and money laundering.

429.   NHEI breached its fiduciary duty to Plaintiff.

430.   Tollhouse breached its fiduciary duty to Plaintiff.

431.   At all relevant times, the Count XXIII Defendants knew, or had a reason to know, that NHEI and Tollhouse owed a fiduciary duty to Plaintiff.

432.   By engaging in, or otherwise participating in the fraudulent acts and/or omissions of NHEI, Tollhouse, and Ambani, the Count XXIII Defendants knew, or had a reason to know, that NHEI and Tollhouse would breach their fiduciary duty to Plaintiff.

433.   In fact, the Count XXIII Defendants knew, or had a reason to know, that NHEI and Tollhouse did breach their fiduciary duty to Plaintiff.

434.   By engaging in, or otherwise participating in, the fraudulent acts and/or omissions of NHEI, Tollhouse, and Ambani referenced above, the Count XXIII Defendants substantially assisted, or otherwise encouraged, NHEI's and Tollhouse's breach of their fiduciary duties to Plaintiff.

435.   As a direct result of the Count XXIII Defendants' conduct, NHEI and Tollhouse breached their obligations to Plaintiff, causing significant damages to Plaintiff, the Bucks Entities, and the Ferry Entities, including exorbitant "interest/loan" payments to Ambani/Tollhouse/NHEI, loss of profits, loss of business, loss of future profits, and costs, the extent of which, to date, is unknown.

436.   The acts of the Count XXIII Defendants were intentional, malicious, inconspicuous, outrageous, and/or grossly reckless.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against the Count XXIII Defendants, each of them, jointly and severally, as follows:

(a)     An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)     An award of punitive damages; and

(c)     Such other relief as the Court deems just and proper.

**COUNT XXIV**
**BREACH OF CONTRACT**
**(Plaintiff v. NHEI)**

437.     Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

438.     On August 18, Plaintiff and NHEI entered into, and agreed to abide by, the operating agreements for Bucks Resort (Ex. 23) and Bucks Hospitality (Ex. 24).

439.     NHEI breached its agreements with Plaintiff by, among others – and acting through Ambani – attempting to remove Plaintiff as manager of the Bucks Entities, attempting to remove Plaintiff as a member of the Bucks Entities, and making capital calls – all without the authority to do so.

440.     Plaintiff has been damaged by NHEI's breach of the operating agreements by, among others, purportedly being removed as manager and member of the Bucks Entities, and therefore losing all the rights and benefits afforded to Plaintiff as a 50% owner of those companies.

**WHEREFORE**, Plaintiff demands judgment against NHEI as follows:

(a)     An award of compensatory damages in an amount to be determined at trial, plus interest; and

(b)     Such other relief as the Court deems just and proper.

## COUNT XXV
## BREACH OF CONTRACT
### (Plaintiff v. Tollhouse)

441.    Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

442.    In or around, Plaintiff and Tollhouse entered into, and agreed to abide by, an operating agreement for Ferry Holdings (Ex. 35).

443.    Plaintiff and Tollhouse also agreed that Tollhouse would provide $450,000 to the Ferry Entities (including $225,000 for a liquor license) in exchange for Plaintiff permitting Tollhouse to become a 50% owner and member of the Ferry Entities.

444.    Tollhouse breached its agreement with Plaintiff by, among others – and acting through Ambani – attempting to remove Plaintiff as a member of Ferry Holdings, and making capital calls, without the authority to do so.

445.    Tollhouse also breached its agreement to provide $450,000 to the Ferry Entities (including $225,000 for a liquor license) in exchange for Plaintiff permitting Tollhouse to become a 50% owner and member of the Ferry Entities.

446.    Plaintiff has been damaged by Tollhouse's breach of the operating agreement – and agreement to provide promised funding – by, among others, (1) purportedly being removed as a member of Ferry Holdings, and therefore losing all the rights and benefits afforded to Plaintiff as a 50% owner of that company; and (2) the Ferry Entities not having the necessary investment funds.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of Ferry Holdings, demands judgment against Tollhouse as follows:

(a)   An award of compensatory damages in an amount to be determined at trial, plus interest; and

(b)   Such other relief as the Court deems just and proper.

## COUNT XXVI
## PARTICIPATION THEORY
**(Plaintiff, individually and derivatively on behalf of the Venture Entities v. Ambani)**

447.   Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

448.   At all relevant times, Ambani was in control of NHEI and Tollhouse, and he knowingly and actively participated in NHEI's and Tollhouse's wrongdoing, including fraud, civil conspiracy, breach of contract, and civil RICO violations, among others.

449.   Ambani directed and/or caused NHEI and Tollhouse to engage in the wrongful acts described herein.

450.   Ambani is personally liable for the wrongful acts committed by NHEI and Tollhouse.

**WHEREFORE**, Plaintiff, individually and derivatively on behalf of the Venture Entities, demands judgment against Ambani as follows:

(a)   An award of compensatory damages in an amount to be determined at trial, plus interest; and

(b)   Such other relief as the Court deems just and proper.

## COUNT XXVII
## DEFAMATION
### (Plaintiff v. Churchill and Martinez)

451.    Plaintiff incorporates herein by reference the allegations contained in all of the above paragraphs as though set forth in their entirety.

452.    Since being unlawfully ousted from The Raven in July of 2016, Churchill and Martinez have engaged in a campaign to discredit Plaintiff with The Raven's staff and clientele, as well as within the New Hope community.

453.    In doing so, Churchill and Martinez have made false and defamatory statements about Plaintiff to third persons.

454.    One example of Martinez's false and disparaging communications concerning Plaintiff is a Facebook message he posted on November 26, 2016, in which he accuses Plaintiff of being pulled over and arrested for driving under the influence.  *See* Martinez's November 26, 2016 Facebook post, attached hereto as Exhibit 89.

455.    Martinez's false and disparaging communications concerning Plaintiff was apparently conveyed to Ambani's counsel, Timothy J. Duffy, who in turn repeated these defamatory communications in his letter dated November 28, 2016, a copy of which is attached hereto as Exhibit 90.

456.    The representations made by Martinez in the foregoing Facebook message are false.

457.    Further, Martinez and/or Churchill made the following false and defamatory remarks concerning Plaintiff:

(a)    On July 7, 2016, Churchill stated to Jean Heath, manager of First National Bank of Newtown, that "[Plaintiff] was terminated for breach of his fiduciary responsibility. He was mismanaging the money at The Raven."

84

(b)     On July 9, 2016, Churchill stated to The Raven staff that Plaintiff is no longer with The Raven, that he has no authority, and that they should not listen to him.

(c)     On or around July 22, 2016, Martinez stated to Nancy Bierman, a business colleague of Plaintiff's, that "[Plaintiff] was stealing money from the company and he charged a $40,000 vacation to The Raven."

(d)     On August 7, 2016, during a meeting with Robert Konoly and Rori Paul (business colleagues of Plaintiff's), Churchill and/or Martinez stated that "[Plaintiff] was running The Raven into the ground" and that he "spent too much money on renovations and didn't pay contractors on time."

(e)     Churchill told The Raven staff about her fabricated and false account of the October 13, 2016 incident where Churchill stalked Plaintiff, confronted him, and shouted threats at him – yet filed a police report representing that Plaintiff threatened her.  *See* <u>Ex. 88</u>.

(f)     In mid-August, 2016, Martinez told Joe Bulgarino, a Raven manager, that "[Plaintiff] stole the company vehicle."

(g)     On November 18, 2016, Martinez told Robert Konoly that "[Plaintiff] hacked The Raven e-mails." *But see* <u>Ex. 72</u>.

458.     The foregoing representations are false.

459.     By their repeated, false, and defamatory statements, Churchill and Martinez have engaged in a course of conduct and have repeatedly committed acts which serve no legitimate purpose; and their conduct is, therefore, illegal in the jurisdiction to which their communications were directed.

460.    By their repeated, false, and defamatory statements, Churchill and Martinez made communications that were designed to harm Plaintiff's personal, professional, and business reputation, and their conduct is, therefore, illegal in the jurisdiction to which the communications were directed.

461.    Churchill's and Martinez's defamatory statements were made maliciously and with intent of embarrassing Plaintiff, and harming Plaintiff's professional reputation, with regard to The Raven's employees and clients, as well as within the New Hope community.

462.    Churchill's and Martinez's statements have, in fact, harmed Plaintiff, including harming Plaintiff's reputation, as well as harming the goodwill and business of The Raven.

463.    Churchill and Martinez have no right or privilege to make the false and defamatory statements they made concerning Plaintiff.

464.    Churchill's and Martinez's acts were intentional, willful, wanton, and/or reckless, warranting imposition of punitive damages against them.

**WHEREFORE**, Plaintiff demands judgment against Churchill and Martinez, jointly and severally, as follows:

(a)    An award of compensatory damages in an amount to be determined at trial, plus interest;

(b)    Punitive damages; and

(c)    Such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of twelve (12) in all issues so triable in the matter.

Respectfully submitted,

KANG HAGGERTY & FETBROYT LLC

By: _____
Edward T. Kang
Gregory H. Mathews
David P. Dean
Jason E. Powell
*Attorneys for Plaintiff Steven Lau,*
*individually and derivatively*
*on behalf of Bucks Hospitality LLC,*
*Bucks Entertainment and Resort Company*
*LLC, Ferry Street Hospitality LLC, and*
*Ferry Street Holdings LLC*

Dated:  December 2, 2016